[This decision has been published in *Ohio Official Reports* at 91 Ohio St.3d 516.]

THE STATE OF OHIO, APPELLEE, *v.* MURPHY, APPELLANT.

[Cite as *State v. Murphy*, 2001-Ohio-112.]

*Criminal law—Aggravated murder—Invocation of right to remain silent is ambiguous or equivocal, when—Crim.R. 24(F)—Waiver—Allowing alternate jurors to attend deliberations is not reversible plain error, when— Mere existence of conflicting evidence cannot make the evidence insufficient as a matter of law—Death penalty upheld, when.*

(No. 98-1586—Submitted October 17, 2000—Decided June 6, 2001.)

APPEAL from the Court of Common Pleas of Franklin County, No. 97CR-05-2877.

_____

ALICE ROBIE RESNICK, J.

{¶ 1} Defendant-appellant, Ulysses C. Murphy, was convicted of murdering Andre Brooks during an aggravated robbery and was sentenced to death.

{¶ 2} Andre Brooks lived in Mansfield. His sister, Condrea Webber, lived in Columbus. On a weekend in May 1997, Webber went to Mansfield to visit her family. On Saturday, May 10, she drove back to Columbus with Brooks.

{¶ 3} They went to the C&S Lounge, a bar on the East Side of Columbus. Arriving sometime before 1:00 a.m., May 11, they left around 2:00 a.m. and went to the F&H Grill.

{¶ 4} The F&H occupied a two-story building; the second floor was an "after-hours bar," *i.e.*, an establishment that serves liquor after the lawful closing time. Webber and Brooks stayed until about 3:30 a.m.

{¶ 5} Murphy was also in the F&H that night. Frank Green, who frequented the F&H and knew Murphy, later testified that Murphy left "[m]aybe a couple minutes" after Brooks and Webber. Brooks was wearing several gold chains

around his neck that evening. These had attracted Murphy's notice, and he decided to rob Brooks to get them.

{¶ 6} Brooks and Webber were near the car when Murphy told them to put their hands up and ordered Brooks "to take off his gold." Brooks asked Murphy to let Webber get into the car.

{¶ 7} As Webber fumbled with the keys, she accidentally set off the car alarm. Brooks told her how to shut it off, while continuing to ask Murphy to give her a chance to get in. Murphy was pointing his gun at Brooks the entire time. Finally, Webber got in, started the car, and put it in drive. Brooks and Murphy were standing at the rear of the car, and Webber could see them in her rear-view mirror. (Although it was night, and the car's rear windshield appears to be tinted, the car was near an outdoor light.)

{¶ 8} Brooks tried to take his gold chains off, with Murphy continually demanding that he "hurry up." Then Brooks tried to scare Murphy away by telling his sister to "reach underneath the seat." But Webber, afraid to support Brooks's bluff, opened the door and turned around to assure Murphy that she had no gun. It was then that she got her best look at Murphy.

{¶ 9} Webber then closed the car door but continued to watch the robbery in the rear-view mirror. Murphy kept yelling at Brooks that he was "moving too slow." Webber then saw Murphy, who was standing slightly over an arm's length from Brooks, take a step back. She heard two quick shots; then her brother screamed and fell. According to Webber, Brooks was shot while still trying to take his chains off. Webber hit the gas pedal and sped to a nearby White Castle restaurant to summon a police officer.

{¶ 10} An autopsy showed that Brooks died of two gunshot wounds. One bullet entered the inside of Brooks's upper left arm near the armpit and went into his torso, breaking a rib, which lacerated his lung and caused bleeding. The other entered his lower back and severed an artery.

**{¶ 11}** Police found three spent shell casings where Brooks was shot. Mark Hardy, a Columbus police criminalist and firearms specialist, examined the casings. Based on firing-pin impressions, extractor and ejector marks, and breech marks found on each casing, Hardy concluded that all three had been ejected from the same gun. Hardy also concluded that both bullets extracted from Brooks's corpse were fired from one gun.

**{¶ 12}** Police showed Webber a photographic array, and she identified Murphy as her brother's killer. She later identified him again in court.

**{¶ 13}** Murphy was arrested and interrogated. At first he denied everything. Ultimately, he admitted that he had shot Brooks while trying to rob him of his chains. He claimed that the gun had accidentally gone off because Brooks tried to grab it. However, he admitted firing a second shot at Brooks when, according to Murphy, Brooks tried to run away after the first shot.

**{¶ 14}** Murphy was indicted for aggravated murder, aggravated robbery, and having a weapon under disability. The aggravated murder count carried a felony-murder death specification. Each count also carried a firearm specification. He was convicted on all counts. After a penalty hearing, he was sentenced to death.

**{¶ 15}** In this appeal, appellant raises twenty propositions of law attacking the validity of his convictions and death sentence. After full consideration, we overrule each proposition of law. We have also independently reviewed appellant's death sentence, as R.C. 2929.05(A) charges us to do, by reweighing the felony-murder aggravating circumstance against the mitigating factors and measuring the sentence in this case against sentences imposed in similar cases. Our analysis leads us to the conclusion that appellant's convictions and death sentence must be affirmed.

## I. Fifth Amendment Issues

**{¶ 16}** In his first proposition of law, appellant contends that his videotaped confession should have been suppressed. He contends, first, that he did not waive

his right to remain silent; second, that police continued to interrogate him after he invoked his right to cut off questioning. See *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313.

## A. Waiver

**{¶ 17}** At 10:38 p.m., May 11, 1997, Detective Viduya began appellant's interrogation by administering *Miranda* warnings. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Viduya then had appellant read the *Miranda* warnings aloud and asked, "Can you explain to me what that means to you?" Appellant stated, "That means I ain't got to say nothing right now, 'til I talk to my lawyer."

**{¶ 18}** After advising appellant of his rights, Viduya did not specifically ask him whether he desired to waive his rights, nor did he ask appellant to sign a waiver form. However, he did explain appellant's rights to him in simple terms. He did give appellant a waiver form, had him read the form aloud, and made sure he understood it. Only then did Viduya proceed to interrogate appellant.

**{¶ 19}** The trial court, ruling on appellant's motion to suppress his ensuing confession, found that appellant understood his rights and displayed "no hesitation" in talking with Viduya. The court also found that appellant had voluntarily waived his right to remain silent.

**{¶ 20}** Appellant contends that he never waived his right to remain silent at all. He stresses the fact that he never signed the waiver-of-right form, and that the trial court improperly found that he implicitly waived this right by talking with police.

**{¶ 21}** It is settled law that a *Miranda* waiver need not be expressly made in order to be valid. *North Carolina v. Butler* (1979), 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292. A court may infer a waiver from the suspect's behavior, viewed in light of all the surrounding circumstances. See cases cited *infra*.

**{¶ 22}** The trial court inferred waiver from appellant's actions. In our view, the record supports that inference. Even though Viduya did not ask appellant if he wished to give up his rights, he did ask him whether he *understood* his rights. Not only did appellant affirm that he understood his rights, he showed his understanding of the right to remain silent: "That means I ain't got to say nothing right now, 'til I talk to my lawyer." He also understood the concept of a waiver: "That means I can talk to you if I want to."

**{¶ 23}** When Viduya questioned him, appellant spoke with no visible reluctance. His original story was exculpatory, and he evidently believed that if he told it well, he would be released. (Thus, once he had told it, he informed Viduya that he was "ready to go home.")

**{¶ 24}** Where a suspect speaks freely to police *after* acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights. See, *e.g.*, *United States v. Ogden* (C.A.5, 1978), 572 F.2d 501, 502-503; *Gorham v. Franzen* (C.A.7, 1985), 760 F.2d 786, 795; *United States v. Hilliker* (C.A.9, 1970), 436 F.2d 101; *People v. Sully* (1991), 53 Cal.3d 1195, 1233, 283 Cal.Rptr. 144, 167, 812 P.2d 163, 185-186; *State v. Williams* (1993), 334 N.C. 440, 464-465, 434 S.E.2d 588, 602-603, vacated on other grounds, *North Carolina v. Bryant* (1994), 511 U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42; *State v. McCluskie* (Me.1992), 611 A.2d 975, 977; *People v. Sirno* (1990), 76 N.Y.2d 967, 563 N.Y.S.2d 730, 565 N.E.2d 479. A suspect's acknowledgment that he understands his rights should not, perhaps, "inevitably carry the day," but such an acknowledgment "is especially significant when defendant's incriminating statement follows immediately thereafter," as was the case here. 2 LaFave, Israel & King, Criminal Procedure (2 Ed.1999) 592, Section 6.9(d), citing *Billings v. People* (1976), 171 Colo. 236, 466 P.2d 474.

**{¶ 25}** The surrounding circumstances also suggest that appellant's waiver was voluntary. Viduya's manner was not threatening; there is no evidence that

police used coercive tactics to obtain the waiver. Appellant told Viduya that he was sober, and this was confirmed by his appearance and demeanor in the video. Thus, the record supports the trial court's finding that appellant voluntarily waived his rights.

## B. Assertion of Rights

{¶ 26} *Michigan v. Mosley*, *supra*, holds that once a suspect invokes his right to remain silent, police must cease to question him. The invocation does not bar further questioning altogether, but police must scrupulously honor the defendant's exercise of his right to cut off questioning. *Mosley*, 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 321, citing *Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

{¶ 27} In this case, appellant told Detective Viduya that he had not been involved in the crime. After telling his version, he said, "I'm ready to quit talking now and I'm ready to go home, too." Viduya left the interrogation room for a few minutes to consult another detective. When he came back, he brought a crime scene technician with him, and the interrogation resumed. Appellant answered without apparent reluctance, and ultimately confessed to holding Brooks up and shooting him.

{¶ 28} Appellant contends that his statement to Viduya that he was "ready to quit talking, and * * * go home, too" was an expression of his desire to stop talking, hence an invocation of his right to remain silent. Since Viduya did not "scrupulously honor" that invocation, appellant contends, his confession should have been suppressed.

{¶ 29} However, police must honor an invocation of the right to cut off questioning only if it is *unambiguous*. *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362, holds that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney. * * * [W]e decline to adopt a rule

requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-462, 114 S.Ct. at 2356, 129 L.Ed.2d at 373.

{¶ 30} Although *Davis* dealt with invocations of the right to counsel, we think it also applies to the right to remain silent. "[E]very circuit that has addressed the issue squarely has concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent." *Bui v. DiPaolo* (C.A.1, 1999), 170 F.3d 232, 239.

{¶ 31} Although a suspect "need not 'speak with the discrimination of an Oxford don,' " *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371, quoting *id.* at 476, 114 S.Ct. at 2364, 129 L.Ed.2d at 382 (Souter, J., concurring in judgment), a suspect "must articulate his or her desire to remain silent or cut off questioning 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an invocation of the right to remain silent." *State v. Ross* (1996), 203 Wis.2d 66, 78, 552 N.W.2d 428, 433, quoting *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371; see, also, *United States v. Mikell* (C.A.11, 1996), 102 F.3d 470, 476. If the suspect says something that may or may not be an invocation of the right, police may continue to question him; they need not treat the ambiguous statement as an invocation or try to clear up the ambiguity. See *Ross*, 203 Wis.2d at 75-76, 552 N.W.2d at 432, and fn. 4 (citing cases); *State v. Owen* (Fla.1997), 696 So.2d 715, 717-718; *State v. King* (Me.1998), 708 A.2d 1014, 1017. Thus, appellant's claim turns on whether his statement was an unambiguous invocation of his right to stop talking.

{¶ 32} The first part of his statement—"I'm ready to quit talking"—might well be read as an unambiguous invocation of the right to remain silent if examined in isolation. However, we must examine appellant's words not in isolation but in context. His full statement was: "I'm ready to quit talking *and I'm ready to go home, too*." (Emphasis added.)

**{¶ 33}** This statement can be interpreted as meaning simply that appellant was ready to "go home." In *Moore v. Dugger* (C.A.11, 1988), 856 F.2d 129, 134, the question "When will you all let me go home?" did not amount to so much as an *equivocal* invocation of the right to silence. Obviously, if appellant had gone home, he would also have stopped talking to the police. What is not clear, however, is whether his readiness to stop talking was independent of his desire to go home.

**{¶ 34}** What appellant appears to have wanted was to be released. Talking to the police was a means to that end; he was trying to persuade them that he was innocent. Thus, his words did not necessarily mean that he wanted to stop talking, no matter what. If the police were not ready to let him go, he may well have wanted to keep trying to persuade them of his innocence.

**{¶ 35}** We conclude that appellant's statement was not an unequivocal assertion of his right to remain silent. Such an ambiguous statement could create no obligation for the police to suspend their questioning of a criminal suspect. We therefore overrule appellant's second proposition of law.

## II. Request for New Counsel

**{¶ 36}** In his fourth proposition of law, appellant contends that the trial court abused its discretion in denying him a continuance so that he could seek to retain counsel to replace his appointed counsel after he became dissatisfied with them.

**{¶ 37}** At arraignment, appellant requested appointed counsel and filed an affidavit of indigence, in which he represented under oath that he was "financially unable to retain private counsel without substantial hardship to me or to my family." The trial court assigned appellant two assistant county public defenders. Appellant later became dissatisfied with their advice, so they sought leave to withdraw. The court granted leave, continued the trial date, and assigned Terry Sherman and Debra Gorrell to represent appellant (who had asked specifically for Sherman).

**{¶ 38}** However, appellant soon became dissatisfied with Sherman and Gorrell. On May 1, 1998, the first day of voir dire, Sherman and Gorrell sought leave to withdraw and requested another continuance so that appellant could retain private counsel. According to Sherman, appellant asked his attorneys to withdraw because, thinking the case "almost impossible to win," Sherman had advised him to "consider an option other than trial." Sherman noted that appellant had nothing against him personally and added, "I like Mr. Murphy a lot."

**{¶ 39}** Appellant stated that "there is nothing inaccurate" in Sherman's statement. Although appellant thought Sherman and Gorrell were "great lawyers," he explained that he wanted to hire his own lawyer because he did not trust a state-paid lawyer to work in his best interest. However, appellant also admitted, "I'm not really sure if I'm going to have the money" to retain counsel, but he wanted thirty days to try and raise it.

**{¶ 40}** Noting that seventy-eight prospective jurors had been called into court, the trial judge overruled the motions for withdrawal and continuance. Appellant then refused to cooperate further and asked to be taken back to his cell. The court granted this request and proceeded with voir dire.

**{¶ 41}** By the next court session, appellant agreed to return to court. That morning, Sherman protested a proposal to put a "stun belt" on appellant. Sherman's representations to the court on this point throw considerable light on his relationship with appellant. Although appellant had been "mouthy," Sherman believed that he now had his client "under control." He stated that appellant "hasn't displayed any problems while he has been incarcerated nor any problems while he was here Friday [May 1]. *He did what we told him*. He * * * didn't cause any problems." Sherman warned that putting a stun belt on appellant would only "cause me to lose *the ground that I've gained*, and I need to work with this guy." (Emphasis added.)

**{¶ 42}** However, before opening statements on May 11, Sherman informed the trial judge that counsel and client were having "a fundamental disagreement"

on how to proceed. Sherman believed that, since the court had declined to suppress appellant's confession, the best remaining defense was to concede that appellant had killed Brooks but argue that he lacked the intent to kill. However, appellant told Sherman that he did not want to take that course.

{¶ 43} Nevertheless, Sherman told the jury in his opening statement that appellant killed Brooks and that the sole issue was whether he had done so with the intent to kill. He then discussed the evidence and told the jury that "you will not find that there was a specific intent to kill."

{¶ 44} At the beginning of the next day's session, appellant requested a mistrial because counsel had disregarded his wishes in choosing a defense. Addressing the court, appellant said, "Now, counsel and myself *have discussed my defense*, and I made it perfectly clear that I was innocent. * * * I *made it very clear* that I didn't want to go in to trial with that defense, but he did it anyway." (Emphasis added.)

{¶ 45} Sherman then told the court that he and appellant were communicating and "getting along." He stated that he and co-counsel had discussed various defense options with appellant, shown him witness-interview summaries, police reports, and investigative reports, and conveyed the state's plea offer. Sherman understood that appellant "did not want us to proceed the way I proceeded." Sherman had explained his view of the case to appellant and asked him to suggest "any plausible * * * avenue that I can pursue."

{¶ 46} Against this factual background, appellant advances three related Sixth Amendment claims.

{¶ 47} First, appellant contends that the trial judge should have assigned different counsel to represent him during the trial court's inquiry into his request for a change of counsel, when it became apparent that his attorneys had essentially "abandoned" him by taking a position contrary to his wishes. We cannot agree. Appellant's sole authority for this claim is *United States v. Wadsworth* (C.A.9,

1987), 830 F.2d 1500, 1510-1511, but we find *Wadsworth* distinguishable. Defense counsel in that case had taken an "adversary and antagonistic" stance toward his client's right to counsel. *Id.* at 1511. But here, Sherman was not averse to appellant's request for new counsel. Nor were he and appellant personally antagonistic, as the record makes clear. Hence, there was no need to assign appellant different counsel for the inquiry.

{¶ 48} Second, appellant takes issue with the result of that inquiry. He contends that his motion for a continuance so that he could hire his own counsel should have been granted.

{¶ 49} The determination of whether to grant a continuance is entrusted to the broad discretion of the trial court. *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus. Relevant factors include "the length of delay requested, prior continuances, inconvenience, [and] the reasons for the delay." *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710, 721.

{¶ 50} Moreover, "[a]n indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate 'good cause' to warrant substitution of counsel." *United States v. Iles* (C.A.6, 1990), 906 F.2d 1122, 1130, quoted in *State v. Cowans* (1999), 87 Ohio St.3d 68, 72, 717 N.E.2d 298, 304. If his complaint is unreasonable, the trial judge may deny the requested substitution. *State v. Deal* (1969), 17 Ohio St.2d 17, 46 O.O.2d 154, 244 N.E.2d 742, syllabus. In evaluating a request for substitute counsel, the court must balance "the accused's right to counsel of his choice [against] the public's interest in the prompt and efficient administration of justice." *United States v. Jennings* (C.A.6, 1996), 83 F.3d 145, 148. "The trial court's decision is reviewed under an abuse-of-discretion standard." *Cowans*, 87 Ohio St.3d at 73, 717 N.E.2d at 304, citing *Iles*, 906 F.2d at 1130, fn. 8.

{¶ 51} Appellant alleges a complete breakdown in communication between him and his assigned counsel. Although there is no right to a "meaningful attorney-

client relationship," *Morris v. Slappy* (1983), 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610, 621, a "total lack of communication preventing an adequate defense" is a factor the court should consider in evaluating a defendant's request for substitute counsel. *Jennings*, 83 F.3d at 148. See, also, *Cowans*, *supra*, at 73, 717 N.E.2d at 305.

{¶ 52} The record does not indicate any breakdown of communications between appellant and his attorneys. Instead, "the record is replete with references to [counsel's] discussions with the defendant." *Iles*, 906 F.2d at 1132. Appellant admitted that he had discussed his defense with counsel and believed he had made his position clear to them. Sherman's statements also show that communication was taking place, and that he understood what appellant wanted. This was not a breakdown in communications but rather a disagreement as to the best line of defense.

{¶ 53} Appellant had already had at least two continuances and one change of counsel. His new request, coming on the first day of voir dire, was ill-timed. And the judge had no reason to believe that appellant could hire counsel. Appellant had already claimed indigence, and he admitted that he still did not have the money to hire a lawyer and was not sure he could get it.

{¶ 54} We conclude that the trial court did not abuse its discretion either by denying appellant's request for continuance or by denying Sherman and Gorrell leave to withdraw.

{¶ 55} Finally, appellant contends that his counsel rendered ineffective assistance by pursuing a strategy against his wishes. Appellant cannot and does not contend that the Constitution reserves the selection of trial strategy to the defendant's personal choice. Decisions about "the viability of certain defenses" are "within the exclusive province of defense counsel to make after consultation with his client." *Lewis v. Alexander* (C.A.6, 1993), 11 F.3d 1349, 1354.

{¶ 56} Instead, appellant argues that counsel were ineffective in rejecting his desired course, because it was "just as reasonable" as the course counsel pursued. However, that implies that counsel's strategy was also as reasonable as appellant's—a concession that dooms appellant's ineffective-assistance claim. To prevail on such a claim, a defendant must show that counsel's actions were professionally unreasonable. See *Strickland v. Washington* (1984), 466 U.S. 668, 690-691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695-696. Appellant can hardly claim that counsel's strategic choice was unreasonable in light of his confession. Hence, he cannot prevail on his ineffective-assistance claim.

{¶ 57} Appellant's fourth proposition of law is overruled.

### III. Voir Dire Issues

### A. Denial of Voir Dire

{¶ 58} The trial court excused prospective jurors Shipka, who had an upcoming vacation, and Wack, who felt unable to serve due to a recent negative experience with the criminal-justice system. In his fifth proposition, appellant complains that the trial court gave the defense no chance to voir dire these jurors before excusing them. However, appellant did not request an opportunity to voir dire either one (though he did object to excusing Shipka). Thus, appellant has waived this issue, and his fifth proposition is overruled.

{¶ 59} We further note that a juror's discharge "on grounds of personal excuse" is a matter "between the court and the jurors, and with which the parties can not, of right, interfere." *Bond v. State* (1872), 23 Ohio St. 349, 355, 1872 WL 78. A party has no right to have any particular juror on the panel. His right is to an impartial jury, and a juror's erroneous excusal does not compromise the jury's impartiality. See, *e.g.*, *United States v. Cornell* (C.C.D.R.I.1820), 25 F.Cas. 650, 656; *State v. Mendoza* (1999), 227 Wis.2d 838, 863, 596 N.W.2d 736, 748 (citing cases); *Jones v. State* (Tex.Crim.App.1998), 982 S.W.2d 386, 392 (citing cases); *People v. Lefebre* (Colo.2000), 5 P.3d 295.

{¶ 60} Excusing prospective jurors without voir dire neither caused any disqualified or biased juror to be seated nor impaired counsel's ability to exercise peremptories. Thus, it did not deny appellant the essential benefits of voir dire. See *Dowd-Feder, Inc. v. Truesdell* (1936), 130 Ohio St. 530, 5 O.O. 179, 200 N.E. 762, paragraph one of the syllabus; *State v. Anderson* (1972), 30 Ohio St.2d 66, 71-72, 59 O.O.2d 85, 89, 282 N.E.2d 568, 571-572; *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623, 637 (explaining the purposes of voir dire). It follows that, if the court erred in excusing the jurors without voir dire, the error would be harmless.

B. Denial of Challenges for Cause

{¶ 61} Prospective juror Council had a cousin who was killed by an armed robber in 1993. He was upset that the killer was never caught.

{¶ 62} Council initially said that he could separate the instant case from that of his cousin. Under defense examination, Council indicated that his cousin's death "probably would" affect him in hearing the case, and he agreed that if he could not hear the case fairly he could not be "a fair juror." He also told defense counsel that he had no doubt about his fairness and did not think that his cousin's death would interfere with his being fair in this case. Council further indicated that he could consider a penalty other than death in a case of murder during armed robbery, that a person's "upbringing" and "personality" might be relevant, and that he was not predisposed toward one penalty over another.

{¶ 63} A prospective juror is not automatically disqualified by the fact that a close relative has been the victim of a crime similar to the crime on trial. See *State v. Allen* (1995), 73 Ohio St.3d 626, 628-629, 653 N.E.2d 675, 680-681; *State v. Allard* (1996), 75 Ohio St.3d 482, 493-494, 663 N.E.2d 1277, 1288; and see, generally, Crim.R. 24(B) (listing grounds for challenge for cause). Instead, the trial judge must determine, on a case-by-case basis, whether the juror "is possessed of a state of mind evincing enmity or bias." Crim.R. 24(B)(9).

{¶ 64} Despite some hesitation, Council ultimately made it clear that his feelings about his cousin's killing would not affect his ability to be impartial. The trial court's ruling on a challenge for cause will not be overturned on appeal if the record supports it. See *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920. "[T]he trial judge saw and heard [Council] and could legitimately validate [his] statements." *Allen*, *supra*, 73 Ohio St.3d at 629, 653 N.E.2d at 681.

{¶ 65} A juror whose views on capital punishment are such that they would prevent or substantially impair his ability to consider mitigating factors, as the law requires, is disqualified. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 2229-2230, 119 L.Ed.2d 492, 502-503; *State v. Williams* (1997), 79 Ohio St.3d 1, 5-6, 679 N.E.2d 646, 653; *State v. Rogers* (1985), 17 Ohio St.3d 174, 178-179, 17 OBR 414, 417-418, 478 N.E.2d 984, 989-990. Appellant claims that the trial court improperly overruled his challenges for cause of three such jurors.

{¶ 66} Venireman Roe said that he "would be able to" impose a sentence other than death, although he "[couldn't] imagine any [such circumstances] right now." Roe stated that he "would start with death and go from there. * * * [I]f conditions are presented to me that make me think that [the sentence] should not be the maximum, then I would consider that." Roe gave examples: if the victim's family asked the jury to spare the defendant's life, or the defendant suffered from a "psychological imbalance." Failing that, Roe would vote for a sentence of death "or at least life without parole." Once Roe was told that the law required the jury to consider mitigating factors, he agreed that he could fully and fairly consider all the evidence.

{¶ 67} Appellant challenged Roe for cause; the challenge was overruled, and appellant struck Roe with a peremptory challenge.

{¶ 68} Venireman Hector stated at the outset that he would not automatically vote to recommend death after a finding of guilty but would decide

whether death was appropriate only after listening to the mitigation presented and deciding what weight to give it. While he said that he would give little weight to certain mitigating factors, he never refused to consider them, and he specifically mentioned others that he would consider.

{¶ 69} Under defense examination, Hector seemed to contradict himself, stating that "if the intent was to kill, I would have to ask for death." Hector then clarified these statements: they referred to a situation where there were no mitigating factors. The trial judge found that Hector had misunderstood defense counsel to be talking about a case with no mitigating circumstances. Thus, the judge overruled the challenge, and Hector sat on the jury.

{¶ 70} Venireman Arnold was seated as an alternate. She stated that "I think I want to listen to everything and look at all sides before I would make a decision." Specifically, she thought "I would want to listen to the mitigation evidence * * * [because] I don't think you get the whole picture unless you do." Only once did she waver from this position, saying, "There is a possibility I would not." However, on further inquiry, it turned out that she had not understood defense counsel's questions.

{¶ 71} The record affords no basis to overturn the trial judge's rulings on these jurors. As soon as each juror understood that he or she would have a legal duty to consider mitigation, each one said he or she could do so. The trial judge could reasonably find that these jurors' ability to weigh mitigating circumstances would not be substantially impaired. We note that the judge was sensitive to this issue and granted other *Morgan* challenges by the defense when called for. We do not think she abused her discretion in denying the ones at issue here.

{¶ 72} Finally, appellant argues that the voir dire of prospective juror Ellsesser revealed bias against the defendant. Ellsesser is a police officer.[1] During

---

1. He did not work for the Columbus Police Department, which investigated Brooks's murder.

16

individual voir dire, Ellsesser was asked if he would be "slanted" because of his police background. He replied: "I will hear the case as the facts are presented to me. I can't change who I am. * * * I don't feel it would be slanted. Maybe somebody else would think it would be." He added that "honor" would require him to follow the judge's instructions.

{¶ 73} Later, on general voir dire, defense counsel asked him: "As somebody who is involved in law enforcement, what do you think about serving as a juror on an aggravated murder case?" He said, "I don't know. *If I was you guys, I wouldn't want me here*, but that's your decision." (Emphasis added.)

{¶ 74} Appellant urged the trial court, as he now urges us, to read Ellsesser's statement, "If I was you guys, I wouldn't want me here," as an admission of bias. However, this statement simply is not the clear-cut confession of bias that appellant claims it is. Ellsesser's statement can easily be understood as a mere acknowledgement of what everyone already knows: defendants generally do not want police officers on the jury. Indeed, Ellsesser had said precisely that during his individual voir dire; that earlier statement may well have influenced the trial court's interpretation of the later one.

{¶ 75} The context of the statement also militates against appellant's reading. The question Ellsesser was answering did not deal with bias, and he had already indicated that he did not feel he would be biased. Moreover, he immediately followed this statement with the comment "The judge will give you instructions. You follow what the law dictates you are to do." On this record, interpreting the words "I wouldn't want me here" as an eleventh-hour admission of bias is not warranted.

{¶ 76} Thus, the record supports the trial court's finding that Ellsesser was not biased.

{¶ 77} The record supports each of the questioned rulings on challenges for cause. Hence, appellant's fifth proposition of law is overruled.

### C. *Batson* Issue

{¶ 78} In his sixth proposition, appellant claims that the prosecutor exercised two peremptories in a racially discriminatory fashion, *i.e.*, that he challenged prospective jurors Jacobs and Watkins because they were black. The Equal Protection Clause of the Fourteenth Amendment strictly prohibits a state actor from engaging in racial discrimination in exercising peremptory challenges. Such discrimination is grounds to reverse a conviction returned by a jury tainted with such discrimination. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; *State v. White* (1999), 85 Ohio St.3d 433, 436-438, 709 N.E.2d 140, 147-149.

{¶ 79} A court adjudicates a *Batson* claim in three steps. In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination. *Purkett v. Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834, 839; *State v. White*, 85 Ohio St.3d at 436, 709 N.E.2d at 147.

{¶ 80} In this case, the prosecutors voluntarily came forward with an explanation why they challenged Watkins and Jacobs; hence, the trial court did not, and we need not, determine whether the defense made the requisite prima facie case. See *Hernandez v. New York* (1991), 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 405; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, 1314. Our analysis therefore proceeds to step two, in which we consider the state's proffered reasons for the challenges at issue.

{¶ 81} The prosecutor claimed that he struck Jacobs because "she said if she perceived any discrepancy [in the evidence], she could not find someone guilty," and also because "in the absence of mitigation, she claims she would vote

for life without parole. * * * She absolutely cannot, in my opinion, follow the law when it comes to the death penalty." These are racially neutral reasons for striking Jacobs.

**{¶ 82}** The state struck Watkins because "[h]e has a feeling that the system here is not fair" and "[h]e felt fine with the O.J. [Simpson] verdict, and anybody that feels fine with the O.J. verdict doesn't sit on my juries." The state argued that approval of the "O.J. verdict" indicated "a predisposition [to believe] that the police are going to plant or manufacture evidence."

**{¶ 83}** Appellant argues that this explanation is not race-neutral because "the 'O.J. trial' was itself a racially charged trial." However, Watkins was challenged on the basis of an *individual* rather than a racial characteristic: an opinion he allegedly held. Compare *Heno v. Sprint/United Mgt. Co*. (C.A.10, 2000), 208 F.3d 847, 855-856 (juror's favorable opinion on affirmative action was race-neutral explanation for strike). Moreover, "disparate impact" analysis does not apply to step two of a *Batson* challenge. *Hernandez v. New York*, 500 U.S. at 362, 111 S.Ct. at 1867, 114 L.Ed.2d at 406. Clearly, the proffered reason for challenging Watkins was race-neutral. That conclusion moves us to step three.

**{¶ 84}** Appellant argues that the state's reason for striking Jacobs—that she could not vote guilty if she perceived any discrepancies, even minor ones, in the evidence—is not supported by the record. However, the prosecutor had asked Jacobs, "You wouldn't want any discrepancies at all, basically?" and Jacobs said, "Yeah."

**{¶ 85}** Appellant also argues that, if the prosecutor's concern was indeed sincere, he would also have struck prospective juror Council, who also thought minor discrepancies were important in determining credibility. A facially neutral reason for a strike may indicate discrimination, if the state uses it only to eliminate jurors of a particular cognizable group. *Coulter v. Gilmore* (C.A.7, 1998), 155 F.3d 912, 921.

**{¶ 86}** Appellant's argument is not persuasive. Council did not say that he "wouldn't want any discrepancies at all," as Jacobs did. Council also admitted that witnesses might have different "perspective[s]" and that discrepancies did not necessarily indicate lying.

**{¶ 87}** The prosecutor also said that he struck Jacobs because she would not vote for the death penalty. Jacobs did seem to say that she would vote for life without parole even if the mitigating factors deserved no weight. However, appellant argues that this justification is disingenuous, because when the question was clarified, Jacobs said that she *could* sign a death recommendation. Thus, the state's claim that Jacobs would never vote for death does seem overstated.

**{¶ 88}** Yet, a valid explanation for a peremptory challenge need not reach the level of a challenge for cause. See *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Jacobs's answers certainly indicated some degree of opposition to capital punishment. While that is insufficient to permit a challenge for cause (see, generally, *Adams v. Texas* [1980], 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589; *Wainwright v. Witt* [1985], 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841), it is highly likely that such an attitude made her undesirable to the prosecution. See *State v. Esparza* (1988), 39 Ohio St.3d 8, 13-14, 529 N.E.2d 192, 198 (state may use peremptories to eliminate jurors based on opposition to death penalty). Thus, the trial court was entitled to conclude that the prosecutor's stated reason for striking Jacobs was sincere.

**{¶ 89}** Appellant offered no evidence of discriminatory intent. The burden of proving intentional racial discrimination was his. Moreover, "[t]he trial court's finding is entitled to deference, since it turns largely 'on evaluation of credibility.' " *State v. White,* 85 Ohio St.3d at 437, 709 N.E.2d at 148, quoting *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. We think the record supports the trial judge's finding with respect to Jacobs.

**{¶ 90}** Appellant argues that the state's reason for striking Watkins—his view on the "O.J. verdict"—was insincere, because the state never asked Watkins any questions about the "O.J. verdict." However, appellant forgets that, before voir dire, the venire members filled out jury questionnaires. Unfortunately, the questionnaires are not in the record, but the voir dire transcript does indicate that they included a question about attitudes toward the "O.J. verdict." Because of this, the prosecutor's failure to discuss the subject further during Watkins's voir dire cannot support a claim of bias.

**{¶ 91}** The racially disparate impact of a justification that is race-neutral on its face can be considered in *Batson* step three as evidence that the claimed justification was pretextual. *Hernandez v. New York*, 500 U.S. at 363, 111 S.Ct. at 1868, 114 L.Ed.2d at 408; *Heno*, *supra*, 208 F.3d at 856, fn. 3.

**{¶ 92}** Appellant appears to suggest that exercising peremptory challenges based on a juror's attitude toward the "O.J. verdict" is a practice having a disparate impact on black jurors. We reject this suggestion for two reasons. First, to find disparate impact, we would have to assume that jurors' opinions about the "O.J. verdict" were likely to vary according to race. The record contains no evidence to support such an assumption.

**{¶ 93}** Second, disparate impact by itself does not violate *Batson*. *Batson* proscribes purposeful discrimination; disparate impact is merely evidence from which discriminatory purpose may be inferred. However, the prosecutor's race-neutral explanation for the strike was also evidence, and the trial judge was free to believe that evidence instead.

**{¶ 94}** Here, the prosecutor stated his belief that a person with a favorable view of the "O.J. verdict" would be predisposed to suspect police of dishonesty. The trial court evidently accepted this explanation. Since appellant cites nothing in the record to suggest that the explanation was less than sincere, we have no basis to disturb the trial court's determination of credibility.

**{¶ 95}** In overruling appellant's *Batson* claims, the trial court implicitly found that he had failed to show intentional discrimination by the state in exercising its peremptory challenges. Our review of the record reveals nothing that would justify us in disturbing that finding. Accordingly, we overrule appellant's sixth proposition of law.

## IV. Alternate Jurors in Deliberations

**{¶ 96}** In both phases of trial, the trial court sent the alternate jurors into the jury room to listen to the jury's deliberations. However, the court strictly commanded the alternates not "to participate in the deliberations in any fashion," even by "gestures" or "facial movements."

**{¶ 97}** It is generally regarded as erroneous to permit alternates to sit in on jury deliberations. See, *e.g.*, *State v. Rocco* (App.1978), 119 Ariz. 27, 28-29, 579 P.2d 65, 66-67; *State v. Boulies* (Colo.1984), 690 P.2d 1253; *State v. Murray* (2000), 254 Conn. 472, 474-477, 757 A.2d 578, 580-581; *Berry v. State* (Fla.App.1974), 298 So.2d 491; *Johnson v. State* (1975), 235 Ga. 486, 493, 220 S.E.2d 448, 454; *Commonwealth v. Smith* (1988), 403 Mass. 489, 493-495, 531 N.E.2d 556, 558-561; *State v. Crandall* (Minn.App.1990), 452 N.W.2d 708, 710-711; *Luster v. State* (Miss.1987), 515 So.2d 1177, 1180; *State v. Scrivner* (Mo.App.1984), 676 S.W.2d 12, 14; *State Hwy. Comm. v. Dunks* (1975), 166 Mont. 239, 531 P.2d 1316; *State v. Bindyke* (1975), 288 N.C. 608, 623, 220 S.E.2d 521, 531; *State v. Coulter* (App.1982), 98 N.M. 768, 652 P.2d 1219; *Yancey v. State* (Okla.Crim.App.1982), 640 P.2d 970; *Commonwealth v. Krick* (1949), 164 Pa.Super. 516, 520-521, 67 A.2d 746, 749; *State v. Grovenstein* (1999), 335 S.C. 347, 517 S.E.2d 216; *Patten v. State* (1968), 221 Tenn. 337, 344, 426 S.W.2d 503, 506-507; *State v. Lightner* (1999), 205 W.Va. 657, 520 S.E.2d 654; *State v. Cuzick* (1975), 85 Wash.2d 146, 530 P.2d 288. Contra *Wilcoxen v. State* (Ind.1993), 619 N.E.2d 574 (alternate jurors may attend deliberations as long as they are instructed not to participate); see, also, *Potter v. Perini* (C.A.6, 1976), 545 F.2d 1048 (finding

error but no prejudice and no constitutional violation); *People v. Valles* (1979), 24 Cal.3d 121, 154 Cal.Rptr. 543, 593 P.2d 240 (alternate may remain in jury room if defendant so stipulates); *State v. Grant* (1986), 221 Mont. 122, 128-130, 717 P.2d 562 (distinguishing *Dunks*). See, generally, *Koch v. Rist* (2000), 89 Ohio St.3d 250, 730 N.E.2d 963.

{¶ 98} In an ordinary criminal case, Crim.R. 24(F) requires that any alternate juror not substituted for a regular juror be discharged when the jury retires. However, in *State v. Hutton* (1990), 53 Ohio St.3d 36, 46-48, 559 N.E.2d 432, 444-445, and paragraph three of the syllabus, we held that the discharge requirement does not apply in a capital case under certain circumstances. In *Hutton,* we held it permissible for a court to retain alternates after the jury retired in the guilt phase and to substitute one of them for a regular juror who became incapacitated *after* the guilty verdict but *before* the jury retired to deliberate in the penalty phase.

{¶ 99} On the other hand, nothing in *Hutton* authorizes alternates who have *not* replaced regular jurors to be present during deliberations. An alternate is part of the "trial jury" if "properly substituted" for a regular juror, *Hutton*, paragraph two of the syllabus, but here the alternates were not substituted. Hence, at least as a technical matter, they were *not* part of the jury. See *Koch*, 89 Ohio St.3d at 251-252, 730 N.E.2d at 965 (alternate was a "non-juror"). But, compare, *State v. Hessler* (2000), 90 Ohio St.3d 108, 123, 734 N.E.2d 1237, 1252 (alternate present during penalty deliberations *was* part of the jury for purposes of *aliunde* rule); *State v. Reiner* (2000), 89 Ohio St.3d 342, 351, 731 N.E.2d 662, 672. It follows that the alternates should not have been present in the deliberations.

{¶ 100} However, no defense objection appears in the trial record to the presence of the alternate jurors. The waiver rule requires that a party make a contemporaneous objection to alleged trial error in order to preserve that error for appellate review. The rule is of long standing, and it goes to the heart of an adversary system of justice.

**{¶ 101}** Even constitutional rights "may be lost as finally as any others by a failure to assert them at the proper time." *State v. Childs* (1968), 14 Ohio St.2d 56, 62, 43 O.O.2d 119, 123, 236 N.E.2d 545, 549. Accord *State v. Williams* (1977), 51 Ohio St.2d 112, 116-118, 5 O.O.3d 98, 100-101, 364 N.E.2d 1364, 1367-1368. The waiver rule operates even in capital cases, for "capital defendants are not entitled to special treatment regarding evidentiary or procedural rules." *State v. Greer* (1988), 39 Ohio St.3d 236, 244, 530 N.E.2d 382, 394; see, also, *State v. Spisak* (1988), 36 Ohio St.3d 80, 83, 521 N.E.2d 800, 803; *State v. Campbell* (1994), 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344.

**{¶ 102}** The Rules of Criminal Procedure make but one exception to the contemporaneous-objection requirement: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B).

**{¶ 103}** Under this rule, we may take notice of waived errors only if they can be characterized as "plain errors." As we have repeatedly emphasized, the plain error test is a strict one: "[A]n alleged error 'does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.' " *State v. Campbell*, 69 Ohio St.3d at 41, 630 N.E.2d at 345, quoting *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. We have warned that the plain error rule is not to be invoked lightly. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus; see, also, *Campbell*, 69 Ohio St.3d at 43, 630 N.E.2d at 346.

**{¶ 104}** It is clear that the error alleged here is subject to the waiver and plain error rules. In *United States v. Olano* (1993), 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508, the United States Supreme Court held that while it was error to let alternate jurors attend deliberations, the error was not reversible under the

24

federal "plain error" standard because it was not shown to have affected a substantial right. The court explained that error in such a case will not be presumed; under Fed.R.Civ.Proc. 52(b), the party complaining of the error has the burden of showing that the alternates disobeyed the court's instructions by participating in the deliberations, either verbally or through body language, or that their presence chilled the deliberative process. Since the respondents made no such showing, there was no basis for finding that the error affected respondents' substantial rights, and hence no basis for reversal as plain error. *Id*. at 739-741, 113 S.Ct. at 1780-1781, 123 L.Ed.2d at 522-524. Accord *State v. Lightner*, 205 W.Va. at 661-664, 520 S.E.2d at 658-661 (applying plain error test). See, also, *Johnson v. Duckworth* (C.A.7, 1981), 650 F.2d 122, 125-126 (explaining why alternates are unlikely to prejudice deliberations); *Johnson v. State* (1977), 267 Ind. 256, 259, 369 N.E.2d 623, 625 (alternate "is in every respect a juror"); *State v. Crandall*, 452 N.W.2d at 711 (alternates are not strangers to the jury).

{¶ 105} Moreover, as the Supreme Court of Appeals of West Virginia noted in applying the waiver rule to a similar case: "The first time [the defendant] uttered any complaint was after the jury was discharged. At that time, the opportunity to correct the error was lost to the trial court." *Lightner*, 205 W.Va. at 664, 520 S.E.2d at 661.

{¶ 106} We are aware that, in some states, a defendant in such a case loses the right to object on appeal *only* by affirmative waiver. That is, failure to object to the presence of an alternate is no bar to claiming error unless the defendant has knowingly, voluntarily, and intelligently agreed to the alternate's presence during deliberations. See*, e.g*., *Boulies,* 690 P.2d at 1257, fn. 7; *Berry*, 298 So.2d 491; *Commonwealth v. Jones* (1989), 405 Mass. 661, 542 N.E.2d 1040 (defendant does not lose right to claim error even if defense counsel agreed to alternate's presence); *Bindyke*, 288 N.C. at 623-630, 220 S.E.2d at 531-535; *Yancey*, 640 P.2d 970; *Cuzick*, 85 Wash.2d 146, 530 P.2d 288.

**{¶ 107}** However, as explained above, we have consistently enforced Ohio's waiver and plain error rules. Appellant would have us make an *ad hoc* exception to those rules in cases where an alternate juror has been erroneously admitted into the jury's deliberations. We think *Olano* gives highly persuasive reasons why no such exception is necessary.

**{¶ 108}** Applying the test for plain error, we cannot find on this record that, "*but for* the [trial court's] error, the outcome of the trial *clearly would have been otherwise*." (Emphasis added.) *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. We therefore hold that plain error is absent here. Thus, appellant waived the issue of the alternate jurors' presence in deliberations by failing to raise it at trial. Appellant's seventh proposition therefore must be, and is, overruled.

## V. Photo Array

{¶ 109} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt *and* the identification was unreliable under all the circumstances." (Emphasis added.) *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819, 830. In his third proposition of law, appellant claims that police used an unduly suggestive photographic lineup to get Condrea Webber to identify appellant as her brother's killer. Hence, he contends, both Webber's in-court and out-of-court identifications of appellant should have been suppressed.

{¶ 110} On May 11, 1997, police showed Condrea Webber an array comprised of six full-face photographs of black males. According to Webber's uncontradicted suppression-hearing testimony, she "immediately" picked out appellant's photo as that of her brother's killer. She was "[o]ne hundred percent sure" of her identification. The police in no way indicated which one she should choose.

{¶ 111} After a hearing, the trial judge overruled appellant's motion to suppress identification, remarking, "Quite frankly, there's nothing suggestive here."

{¶ 112} Appellant contends that the other photos in the array were so unlike his that the array was suggestive. However, we affirm the trial court's contrary finding. "A defendant in a lineup need not be surrounded by people nearly identical in appearance." *State v. Davis* (1996), 76 Ohio St.3d 107, 112, 666 N.E.2d 1099, 1105. Furthermore, the other five photos in the array are all reasonably close to appellant's photo in appearance, showing no significant variations in hair length, complexion, age, features, or dress.

{¶ 113} Appellant claims that, while several of the photos depicted men with facial hair, he had none. However, that is incorrect. Appellant's photo in the

array shows a short, scraggly chin beard. Four of the other five subjects also had short beards. Three of the other four bearded subjects did have mustaches, unlike appellant; however, those three had only thin, inconspicuous mustaches.

{¶ 114} Appellant's photo does not stand out in any way. Hence, the array was not suggestive, and appellant's third proposition of law lacks merit.

## VI. Prosecutorial Misconduct

{¶ 115} Appellant's eighth and sixteenth propositions of law charge prosecutorial misconduct in both phases of trial. Although the prosecution did engage in some improper argument, appellant's claims are waived because he did not object at trial.

{¶ 116} In his eighth proposition, appellant makes only one claim of guilt-phase misconduct. In closing, the prosecutor argued: "While [Brooks's mother] was spending her Mother's Day driving to Columbus to identify the body of her son, [appellant] is taking his girlfriend and mother out for dinner, not a care in the world." The defense objected on the ground that "[t]hat's not in evidence."

{¶ 117} This isolated statement, while improper, was not outcome-determinative in this case, given that appellant shot Brooks in front of an eyewitness and then confessed to doing it. Appellant's contention is without merit.

{¶ 118} The rest of appellant's eighth proposition deals with alleged penalty-phase misconduct, as does his sixteenth proposition. Again, all these issues were waived at trial, and we find that none of the errors alleged amounted to plain error. Appellant's eighth and sixteenth propositions are therefore overruled.

## VII. Instructions

### A. Guilt Phase

{¶ 119} In his ninth proposition, appellant alleges that the trial court instructed the jury improperly in the guilt phase.

{¶ 120} Appellant concedes that he did not object at trial to any of the allegedly erroneous instructions. Hence, unless appellant can demonstrate plain

error, each objection is waived. Appellant contends that because the state's evidence was weak, the outcome of this case would clearly have been otherwise had these alleged errors not occurred. *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. We cannot agree. The evidence here was more than sufficient to allow the jury to find appellant guilty beyond a reasonable doubt. (See discussion of appellant's eleventh proposition, *infra*.) Thus, we cannot say that the outcome would *clearly* have been otherwise but for the alleged errors.

### B. Penalty Phase

{¶ 121} In propositions twelve through fourteen, appellant claims error in the penalty-phase instructions. However, appellant actually requested each of the instructions that he now contends were erroneous. In fact, the trial court gave appellant's proposed instructions almost verbatim.

{¶ 122} Thus, appellant was "actively responsible," *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196, 197, for what he now claims to be error. Under the settled principle of invited error, a litigant may not "take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co*. (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus, citing *Lester v. Leuck* (1943), 142 Ohio St. 91, 26 O.O. 280, 50 N.E.2d 145, paragraph one of the syllabus. See, also, *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422. We therefore overrule appellant's twelfth, thirteenth, and fourteenth propositions of law.

{¶ 123} Although we overrule these propositions on the basis of the invited-error doctrine, we note that appellant's contentions lack merit in any event. Because appellant attacks the instructions as not only incorrect, but egregiously so, a brief review of his contentions is in order, to dispel any concern that he was sentenced on the basis of egregiously incorrect instructions. See, generally, *State v. Campbell*, 69 Ohio St.3d at 41, 630 N.E.2d at 344-345, fn. 2.

{¶ 124} Appellant's twelfth proposition identifies four alleged errors in the penalty-phase instructions. The first was when the trial court instructed that "an aggravating circumstance is something that makes the defendant's crime more serious and which, therefore, makes the death penalty more appropriate for the defendant than a sentence of life imprisonment."

{¶ 125} Appellant contends that this instruction creates a presumption that death is appropriate simply because an aggravating circumstance has been proven. It does not: it merely explains the *function* of an aggravating circumstance. Other instructions clearly explained to the jury that it must weigh the aggravating circumstance against the mitigating factors and recommend life unless persuaded beyond a reasonable doubt that the former outweighed the latter.

{¶ 126} The trial court also instructed: "[M]itigating factors are the opposite of aggravating circumstances." According to appellant, this implied that mitigating circumstances are circumstances that reduce the defendant's guilt in the felony murder.

{¶ 127} However, the judge's very next words were: "That is, a mitigating factor is a factor that, in your individual judgment, makes a life sentence more appropriate for Ulysses Murphy than a sentence of death." Then the judge specifically divorced the concept of guilt from that of mitigation: "In order to decide that something is a mitigating factor which would render a life sentence more appropriate, you do not have to believe that it excuses or justifies the crime itself." Compare *Eddings v. Oklahoma* (1982), 455 U.S. 104, 113, 102 S.Ct. 869, 876, 71 L.Ed.2d 1, 10. The trial court also fully explained the concept of mitigating factors.

{¶ 128} Finally, appellant contends that the trial court erroneously instructed that "a life sentence could be returned only if the mitigating factors outweighed the aggravating circumstances." However, the instruction appellant cites said nothing of the kind. What it actually said was, "You might decide that the mitigating factors, taken together, outweigh the one aggravating circumstance,

taken alone. In that event, your vote as an individual juror must be for a penalty of life imprisonment."

{¶ 129} This was part of a comprehensive instruction outlining "four possibilities." In his brief, appellant chooses to quote only part of the trial court's instruction. The court explained that the jury "might decide that the one aggravating circumstance, taken alone, outweighs the mitigating factors, taken together"; or "that the mitigating factors, taken together, outweigh the one aggravating circumstance, taken alone"; or "that the weight of the one aggravating circumstance, taken alone, is equal to the weight of all the mitigating factors taken together"; or that the jury "may not be able to decide which side outweighs the other."

{¶ 130} Thus, the instruction at issue did say that the jury must recommend life *if* mitigation outweighed aggravation—which, of course, is true. See R.C. 2929.03(D)(2). However, it did not even remotely suggest that the jury could recommend life *only* if mitigation outweighed aggravation.

{¶ 131} To the contrary, the full instruction made clear that a juror could vote for death *only* if he or she found that *aggravation outweighed mitigation*. In each of the other three situations outlined by the instruction—where mitigation outweighed aggravation, where the two were in equipoise, and where the jurors could not decide which had greater weight—the trial court instructed the jury in plainest English that "[y]our vote as an individual juror *must be for a penalty of life imprisonment*." (Emphasis added.)

{¶ 132} In his thirteenth and fourteenth propositions of law, appellant contends that the trial court gave instructions inconsistent with *State v. Brooks* (1996), 75 Ohio St.3d 148, 159-160, 661 N.E.2d 1030, 1040-1041, which holds that a jury need not *unanimously* reject the death penalty before it may consider a life sentence.

{¶ 133} In his thirteenth proposition of law, appellant objects to the following instruction: "Your decision will depend on whether the prosecution proves to each and every one of you, beyond a reasonable doubt, that the death penalty should be imposed. If the prosecution succeeds in doing this, then you, the jury, must return a verdict of death. If the prosecution does not succeed in doing this, then you, the jury, must return a verdict of life imprisonment."

{¶ 134} Appellant suggests that the above instruction was inconsistent with *Brooks*. We disagree. The instruction says that if the jury does find "that the death penalty should be imposed" (*i.e.*, if it finds that aggravation outweighs mitigation), it *must* recommend death. That, of course, is a correct statement of law. See R.C. 2929.03(D)(2); *State v. Allen*, 73 Ohio St.3d at 638-639, 653 N.E.2d at 687. The instruction states nothing about unanimity nor does it state anything about the order in which the jury should proceed. Moreover, the trial court specifically instructed that "if the jurors cannot agree unanimously that death is the only appropriate verdict in this case, then the jury as a whole must return a verdict of life imprisonment."

{¶ 135} In his fourteenth proposition, appellant attacks an instruction that states, "Just as the verdict of death must be reached by unanimous agreement, so also the choice between the three life imprisonment verdicts must be reached by unanimous agreement."

{¶ 136} Again, appellant claims that this is inconsistent with *Brooks*. Again, appellant's *Brooks* claim fails. *Brooks* holds that the jury need not unanimously reject the death penalty in order to recommend a life sentence, and the trial court's instructions were clear on that point. However, if the jury recommends life, Ohio law requires it to choose a specific type of life sentence: life without parole, life with parole eligibility after twenty-five years, or life with parole eligibility after thirty years. See R.C. 2929.03(D)(2)(a). Nothing in *Brooks* implies that the jury may recommend one of these options on a less-than-unanimous vote.

To the contrary, *Brooks* states that "the jury, when it cannot unanimously agree on a death sentence, [is required] to move on in their deliberations to a consideration of which life sentence is appropriate, *with that determination to be unanimous*." (Emphasis added.) *State v. Brooks*, 75 Ohio St.3d at 162, 661 N.E.2d at 1042.

{¶ 137} Finally, dictum in *Brooks* states that the jury should be instructed that "a solitary juror may prevent a death penalty recommendation." *Id*. Appellant complains that the trial court's instructions "left the jurors unaware" of that fact. This contention is incorrect. The trial court gave the following instruction, which made it entirely clear that a solitary juror could prevent a death recommendation: "[I]f any single juror * * * votes individually for a verdict of life imprisonment, then *the entire jury is obligated by law to return a verdict of life imprisonment*." (Emphasis added.) Nothing could be more straightforward.

{¶ 138} We overrule appellant's ninth proposition as waived, and his twelfth, thirteenth, and fourteenth propositions under the doctrine of invited error.

VIII. Ineffective Assistance

{¶ 139} In his tenth and seventeenth propositions of law, appellant contends that his trial counsel rendered ineffective assistance at both the guilt and penalty phases.

{¶ 140} Ineffective-assistance claims are governed by a two-part test. To prevail, the defendant must show (1) deficient performance by counsel, *i.e.*, performance falling below an objective standard of reasonable representation, and (2) resulting prejudice, *i.e.*, a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 363-364, 120 S.Ct. 1495, 1497, 146 L.Ed.2d 389, 416; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

A. Guilt Phase

{¶ 141} In his tenth proposition, appellant contends that his counsel rendered ineffective assistance by failing to question a juror on voir dire. However, we have recognized that counsel is in the best position to determine whether any potential juror should be questioned and to what extent. *Id*. at 143-144, 538 N.E.2d at 381; *State v. Mason* (1998), 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932, 948-949.

{¶ 142} Appellant contends that, if we find that counsel failed to make out a prima facie case of racial discrimination with respect to his *Batson* claim, that failure constituted ineffective assistance. (See discussion of sixth proposition of law, *supra*.) However, since the state here voluntarily offered reasons for the peremptory challenges at issue, it does not matter whether a prima facie case was made or not. *Hernandez v. New York*, 500 U.S. at 359, 111 S.Ct. at 1866, 114 L.Ed.2d at 405; *State v. Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

{¶ 143} When the state played appellant's videotaped confession in court, the judge suggested that the court reporter need not transcribe the audio portion. Counsel agreed to this; appellant now argues that counsel should have insisted that the tape be transcribed.

{¶ 144} We agree with appellant that the court reporter's failure to transcribe the video violated the requirement of Crim.R. 22 that "[i]n serious offense cases *all* proceedings shall be recorded." (Emphasis added.) We do not agree, however, that counsel's failure to object was ineffective assistance. This lapse did not affect the outcome of the trial in any way, nor will it affect the outcome of this appeal. The video is in the record, and the lack of a transcript does not prevent us from fully reviewing appellant's Fifth Amendment claims.

{¶ 145} Appellant claims that counsel should have objected at trial to the prosecutor's alleged misconduct in arguing to the jury. A failure to object to such misconduct may, in a given case, be the product of attorney error. However, as we have recognized, there are significant disadvantages to interrupting opposing

counsel's argument. Hence, it is also possible that, in a given case, those disadvantages may outweigh the advantages of objecting to misconduct. In such a case, defense counsel may make a reasonable tactical decision not to object. See *State v. Campbell,* 69 Ohio St.3d at 52-53, 630 N.E.2d at 352; *State v. Keene* (1998), 81 Ohio St.3d 646, 668, 693 N.E.2d 246, 264. Since the burden of showing attorney error is on appellant, we cannot presume such error; and since nothing in the record shows *why* counsel did not object, we cannot find that the failure to object was the product of error.

{¶ 146} Appellant further contends that his counsel should have objected to two allegedly erroneous jury instructions. Yet, contrary to appellant's claim, the trial court never instructed the jury to disregard discrepancies in the evidence. (See discussion of ninth proposition of law, *supra*.) As for the court's instruction on the standard of proof, the trial court gave the reasonable doubt instruction required by R.C. 2901.05(B) and (D). An objection to that instruction would have had no support in then-existing law, see *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604, so counsel had no obligation to raise it. See *State v. Keene*, 81 Ohio St.3d at 668, 693 N.E.2d at 264; *State v. McNeill* (1998), 83 Ohio St.3d 438, 449, 700 N.E.2d 596, 607.

{¶ 147} Finally, appellant's counsel did not object to the presence of alternate jurors in the jury room during deliberations. The record does not disclose why counsel did not object; and appellant has failed to carry his burden of persuasion on this issue. Moreover, appellant makes no attempt to show prejudice, as *Strickland* requires. This clearly is not a situation in which the Sixth Amendment would require us to presume prejudice. See *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067, 80 L.Ed.2d at 696; compare *Olano*, 507 U.S. at 741, 113 S.Ct. at 1781, 123 L.Ed.2d at 524 (for plain error purposes, no presumption of prejudice arises from alternate's presence in deliberations, citing *Strickland*).

{¶ 148} Appellant's tenth proposition of law is overruled.

B. Penalty Phase

{¶ 149} Appellant's seventeenth proposition of law claims ineffective assistance in the penalty phase.

{¶ 150} First, appellant claims that his counsel should have objected to the instruction that "an aggravating circumstance is something that makes the defendant's crime more serious and which, therefore, makes the death penalty more appropriate for the defendant than a sentence of life imprisonment." Appellant contends that this instruction creates "a presumption [in favor of] a death sentence."

{¶ 151} We disagree. The trial court explained to the jury that it must weigh the aggravating circumstance against the mitigating factors and recommend life unless persuaded beyond a reasonable doubt that the former outweighs the latter.

{¶ 152} Moreover, appellant's claim that defense counsel did not review the penalty-phase instructions before the trial court gave them is inconsistent with the fact that defense counsel actually submitted the instructions the trial court gave.

{¶ 153} Next, appellant contends that defense counsel should have objected to alleged prosecutorial misconduct in the penalty phase. However, such decisions are within the scope of trial counsel's reasonable tactical judgment.

{¶ 154} Appellant contends that the prosecutor improperly asked the jury to consider the impact of the crime on Brooks's family. However, even assuming that defense counsel's failure to object was unreasonable, it does not meet *Strickland*'s prejudice test, because there is no reasonable likelihood that appellant would have received a life sentence but for this remark.[2]

{¶ 155} Appellant's other misconduct claims were not supported by existing law. For instance, he argues that the prosecutor improperly asked a penalty-phase witness a question not supported by the evidence. However, nothing

2. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 679, 687 N.E.2d 1358, 1369. Compare *State v. White* (1999), 85 Ohio St.3d 433, 441-447, 709 N.E.2d 140, 151-155; *State v. McNeill* (1998), 83 Ohio St.3d 438, 445-447, 700 N.E.2d 596, 605; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 438-440, 650 N.E.2d 878, 881-883.

in the record shows that the prosecutor lacked a good-faith belief that a factual predicate for the question existed. See *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph two of the syllabus, modifying *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 156} Appellant accuses the prosecutor of making an improper religious appeal in closing argument by saying that appellant "will have to ask God for" the mercy his counsel had asked of the jury. See *People v. Hill* (1998), 17 Cal.4th 800, 836-837, 72 Cal.Rptr.2d 656, 676, 952 P.2d 673, 693 (appeal to religious authority in support of the death penalty is improper). However, the prosecutor's comment was a response to the *defense* use of a religious appeal as a basis for mercy: "[W]e are taught in our Sunday schools that mercy is good [and] that we may hate the sin but care for the sinner. * * * Spare the life of Ulysses Murphy, and you, too, * * * will be blessed." The prosecutor's reply was a fair response to which defense counsel could not have validly objected.

{¶ 157} The prosecutor said that the penalty phase was about "what we allow in our society." But we have allowed prosecutors to urge the jury to uphold community standards. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 571-572, 605 N.E.2d 884, 899-900; *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 23 OBR 13, 17, 490 N.E.2d 906, 911. Defense counsel did not, therefore, behave unreasonably by not objecting.

{¶ 158} The prosecutor argued on rebuttal that appellant was no "kid," but "a 26-year-old man, who, after going through his entire juvenile life without a record, decided * * * to take up a life of crime, deal drugs, carry guns, get shot, shoot other people."

{¶ 159} Again, however, defense counsel would have had no basis to object. The defense argued that appellant "wouldn't be here [in court] today" but for the shortcomings of his parents, and that he "will mature" in prison. The state was entitled to rebut this by arguing that appellant's crime resulted from freely

made adult choices, not immaturity or childhood neglect as claimed by the defense, and to demonstrate this by contrasting appellant's clean juvenile record with his adult criminality.

{¶ 160} Appellant contends that it was misconduct for the prosecutor to argue that he displayed no remorse in his confession, inasmuch as the defense had not raised the issue of remorse. In fact, the defense *had* raised the issue. A defense psychologist testified in the penalty phase that Murphy admitted his guilt to her with sadness, remorse, and regret. There was no basis for objection to the state's argument, which directly responded to this testimony.

{¶ 161} Next, appellant contends that members of Brooks's family did not want a death sentence, and that defense counsel therefore should have brought this fact to the attention of the jury as a mitigating factor.

{¶ 162} However, the record before us does not indicate whether defense counsel knew about this at the time of the penalty phase, or whether they could have discovered it through reasonable investigative efforts. The record indicates only that Brooks's relatives publicly expressed opposition to a death sentence *after* the jury made its recommendation. At that point, defense counsel did file a motion asking the trial judge to take this factor into account in sentencing.

{¶ 163} Moreover, not calling Brooks's relatives to express their wishes to the jury may have been a tactical decision, and if so it was an arguably sound one. At the final sentencing hearing, five of Brooks's relatives spoke before the trial judge. Only three actually said that appellant should get a life sentence, and their reasons for saying so were born of anger and bitterness, and could have hurt rather than helped appellant's cause. Brooks's stepfather hoped that appellant would get life because it would be *worse* than death. Brooks's father told Murphy at the sentencing hearing that he hoped Murphy would "get life without parole and stay there until [he] rot[s]." A reasonable attorney could have feared that the evident

bitterness and anger of these relatives would affect the jury more than their expressed wishes.

{¶ 164} Finally, appellant contends that his counsel failed to fully investigate possible mitigating factors. He argues that counsel should have called an expert witness on "cultural diversity," but he does not explain what such a witness could have said on his behalf. He also argues that counsel should have called an expert witness on fetal alcohol syndrome and should have obtained a neuropsychological assessment to investigate possible organic brain impairment. However, the record does not show that defense counsel failed to investigate these possibilities. Contrary to appellant's suggestion, we cannot infer failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on him.

{¶ 165} The record shows that counsel did search for and present extensive evidence of mitigating factors. The defense called eleven penalty-phase witnesses who testified about appellant's neglected childhood in an alcoholic home, and his personality, intelligence, and redeeming qualities. "Attorneys need not pursue every conceivable avenue; they are entitled to be selective." *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 166} Appellant's seventeenth proposition is overruled.

IX. Evidentiary Sufficiency

**{¶ 167}** In his eleventh proposition of law, appellant contends that the state introduced insufficient evidence to support his conviction. Appellant claims that the state failed to prove that he was Brooks's killer and that he intended to kill. In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶ 168}** Appellant's confession and Webber's eyewitness testimony, if believed, are easily sufficient to allow a jury to find that appellant killed Andre Brooks. Appellant argues that this evidence is unreliable, but on review for evidentiary sufficiency we do not second-guess the jury's credibility determinations; rather, we ask whether, "*if believed*, [the evidence] would convince the average mind of the defendant's guilt beyond a reasonable doubt." (Emphasis added.) *Jenks*, paragraph two of the syllabus.

**{¶ 169}** The evidence here was also sufficient for the jury to find beyond a reasonable doubt that appellant intended to kill. Because appellant used a deadly weapon, the jury could infer that he intended the result. See, *e.g.*, *State v. Clark* (1988), 38 Ohio St.3d 252, 256, 527 N.E.2d 844, 849. Other evidence also supports that inference. Three shell casings found at the scene had been ejected from the same gun, permitting an inference that appellant fired three shots. Webber testified that appellant took a step back before shooting Brooks. Finally, one of the two shots that hit Brooks was fired into Brooks's back.

**{¶ 170}** Thus, viewing the evidence in the light most favorable to the state, the trier of fact could reasonably find that appellant fired multiple shots into Brooks

at close range. These circumstances support the jury's finding that appellant intended to kill Brooks.

{¶ 171} Appellant argues that the state failed to prove intent to kill because "there was conflicting evidence regarding whether [Brooks] grabbed for the gun." Evidentiary conflicts are for the jury, see *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; thus, the mere existence of conflicting evidence cannot make the evidence insufficient as a matter of law.

{¶ 172} Appellant's eleventh proposition is overruled.

X. Trial Court's Sentencing Opinion

{¶ 173} In his fifteenth proposition, appellant argues that the trial court's sentencing opinion does not sufficiently explain why the court found that the aggravating circumstance outweighed the mitigating factors. However, the opinion contains more than three pages discussing mitigating factors in detail and "specif[ying] * * * what weight the [judge] gave to proven mitigating factors." *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131. The trial court gave no weight to much of appellant's proffered mitigation and little weight to the rest. The court then went on to state:

"While Defendant's childhood was less than ideal, even in the absence of parental influence, he was able to lead a law abiding life through his teen years. On May 11, 1997, Defendant chose to take the life of a fellow human being in order to carry out a robbery."

{¶ 174} The opinion thus sufficiently explains why the trial court found that the aggravating circumstance outweighed the mitigating factors.

{¶ 175} Appellant also criticizes the trial court's decision to afford little weight to his "background and upbringing" as the son of alcoholic and absent parents. However, "[t]he weight, if any, to be given mitigation evidence is a matter

for the discretion of the sentencer." *Fox,* 69 Ohio St.3d at 193-194, 631 N.E.2d at 132; see, also, *State v. Richey* (1992), 64 Ohio St.3d 353, 370, 595 N.E.2d 915, 929.

{¶ 176} Appellant's fifteenth proposition is overruled.

## XI. Settled Issues

{¶ 177} It is our practice to rule summarily on well-settled points of law. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak,* 36 Ohio St.3d at 82, 521 N.E.2d at 801-802. Thus, we summarily overrule appellant's eighteenth proposition of law on authority of *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, and *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768. We summarily overrule his nineteenth proposition on authority of *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, paragraph one of the syllabus.

## XII. Cumulative Error

{¶ 178} In his twentieth proposition, appellant asks us to hold that the errors alleged in his brief cumulatively prejudiced his trial and sentencing. We find no merit to this proposition of law.

## XIII. Independent Sentence Review

{¶ 179} R.C. 2929.05(A) requires us to review appellant's death sentence independently.

### Aggravating Circumstance

{¶ 180} Appellant was convicted of a felony-murder aggravating circumstance under R.C. 2929.04(A)(7). The evidence included his confession, eyewitness testimony by Condrea Webber, three shell casings left at the scene, and two bullets removed from Brooks's body. The evidence supports the finding that appellant killed Brooks intentionally, as the principal offender, and while committing aggravated robbery.

Mitigating Factors

{¶ 181} Appellant called eleven penalty-phase witnesses, including both of his parents, others who knew him as a child, social workers and school personnel familiar with the household situation, a jail supervisor, and a clinical psychologist. Appellant made no unsworn statement.

{¶ 182} Appellant was born in 1971, the fifth child of Barbara Murphy. His father, Ulysses Woods, was then married to another woman. Woods and Barbara Murphy lived together for about six weeks after appellant's birth, but they did not get along, and Woods moved out for good. Although he worked, he gave Barbara little money.

{¶ 183} Appellant's parents were both alcoholics. Appellant's father spent much of his time in bars and got drunk daily. As a child, appellant wanted to spend time with his father, but hardly ever did, because whenever he wanted to see his father, appellant had to go to whatever bar his father happened to be in at the time.

{¶ 184} Nor was appellant's mother much of a presence in his life. Barbara Murphy worked during the day; after work, she spent her time in bars. She drank six days a week and spent her Sundays sleeping. At times, she had a babysitter stay with her children; often, however, she left them home alone. There was food in the house, but frequently nobody was there to fix a meal. As a result, appellant frequently went to a neighbor's house for dinner. Appellant's sister, aunt, or grandaunt occasionally took him to the movies.

{¶ 185} Appellant's grandmother, Eleanor Woods, tried to maintain as much contact with appellant as she could, but Barbara discouraged it. Sometimes when appellant visited his grandmother, he would complain that his brothers beat him up and refused to feed him. Sometimes he would say, "None of them love me."

**{¶ 186}** When appellant was sixteen, Barbara filed her fifth incorrigibility complaint against him and threw him out of the house. Franklin County Children Services then placed him with his grandmother.

**{¶ 187}** Dr. Jolie Brams, a clinical psychologist with expertise in the field of child development, interviewed appellant several times and reviewed extensive school and children services records on him and his family.

**{¶ 188}** Dr. Brams explained the importance of parental nurturing to a child's development. Nurturing involves "being a model," showing the child how to live and how to set and attain goals. Without nurturing, a child becomes angry and depressed. A child who never learns how to attain goals can develop feelings of worthlessness and frustration.

**{¶ 189}** According to Dr. Brams, appellant was a grossly neglected child who got no nurturing from his alcoholic parents and essentially "raised himself." School or community connections might have offset familial neglect and helped him to develop, but these were also lacking. Appellant attended eleven schools in seven years, quitting in the eighth grade, and his family was isolated from the community.

**{¶ 190}** We note, however, that in cataloguing appellant's developmental disadvantages, Brams did not take into account his relationship with his grandmother. Brams mistakenly testified that appellant's grandmother was mentally ill, abusive, and alcoholic. She later retracted that testimony, admitting that she had confused appellant's grandmother with his mother.

**{¶ 191}** Appellant himself began drinking heavily at age eleven or twelve. Frustration and depression, the fruits of neglect, contributed to his drinking. Genes may have been a factor as well: both parents and eighty percent of his first- and second-degree relatives were alcoholics. Appellant told Brams that he was drunk when he shot Brooks.

{¶ 192} As a young teenager, appellant would steal food or beer at times but did not indulge in what Dr. Brams characterized as "*grossly* delinquent behavior." (Emphasis added.)  As an adult, he became a small-time drug dealer. He had two convictions for drug offenses and one for carrying a concealed weapon, and served two brief prison terms.  In prison, appellant was guilty of insubordination because he was too "unmotivated" to do assigned work.  Once appellant threw a blanket over an inmate's head while another person robbed the inmate.

{¶ 193} Dr. Brams testified that appellant did not have "mental health problems."  She described him as intelligent and as possessing "decency." Appellant showed remorse when he discussed the murder with Brams.

{¶ 194} Brams felt that appellant had acquired enough "insight" about his life to see that he had wasted his talents.  She thought that, given a life sentence, he "can do something productive and meaningful with his life."  His earlier prison terms had been too short to motivate him to change, but a life sentence would keep him from drinking, allow him to participate in programs, and foster his "innate desire to do something."  On the other hand, Dr. Brams admitted on cross-examination that appellant's score on the MMPI (a personality test) was consistent with impulsiveness, difficulty in controlling anger, and antisocial tendencies.

{¶ 195} Sheriff's Deputy Matthew Massie was a supervisor at the Franklin County Jail.  Massie testified that inmates there have little to do, which causes disciplinary problems.  Yet, although appellant had been jailed for over a year at that time, jail records did not show that he broke any rules during his stay.

{¶ 196} Finally, Brooks's father, sister, and stepfather expressed the view that appellant should get life without parole rather than death.

{¶ 197} Appellant's chief mitigating factor was his neglected childhood.  It is clear that appellant grew up with little or no moral guidance.  This is entitled to some weight, but we have seldom accorded strong weight to a defendant's

childhood. See, *e.g.*, *State v. Holloway* (1988), 38 Ohio St.3d 239, 245-247, 527 N.E.2d 831, 839; *State v. Cooey* (1989), 46 Ohio St.3d 20, 41, 544 N.E.2d 895, 919; *State v. Murphy*, 65 Ohio St.3d at 585-586, 605 N.E.2d at 908; *State v. Campbell*, 69 Ohio St.3d at 54-55, 630 N.E.2d at 353-354. In his confession to police, appellant claimed that he was drunk when he shot Brooks, but he offered no corroboration of that claim at trial, and in any case voluntary intoxication is entitled to little weight. *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710, 714.

{¶ 198} Appellant's record before shooting Brooks appears to have involved no serious violence, a fact that deserves some weight. On the other hand, his good behavior in jail while awaiting trial deserves little weight, given his record of disciplinary violations in prison. Nor can we give any substantial weight to appellant's late expression of remorse. See *State v. Baston* (1999), 85 Ohio St.3d 418, 431, 709 N.E.2d 128, 139.

{¶ 199} We have considered the testimony of Dr. Brams that appellant has "decency," "insight," and a potential to "do something productive and meaningful with his life." However, in our view that opinion is too vague and too weakly supported to deserve substantial weight.

{¶ 200} Finally, we note that, in their statements to the sentencing judge, Brooks's father, sister, and stepfather indicated that appellant should receive a life sentence. However, their support for a life sentence appears to have been premised not on mercy but on the view that a life sentence would be a more severe punishment than death. That is not an unreasonable view, perhaps, but we do not share it. These statements, therefore, have virtually no weight in mitigation.

{¶ 201} On the whole, we find that appellant's mitigation is weak. We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

Proportionality

{¶ 202} We further find that the death sentence in this case is proportionate to death sentences that we have approved in other robbery-murder cases. See, *e.g.*, *State v. Lindsey* (2000), 87 Ohio St.3d 479, 721 N.E.2d 995; *State v. Bays* (1999), 87 Ohio St.3d 15, 716 N.E.2d 1126; *Baston*, 85 Ohio St.3d 418, 709 N.E.2d 128; *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482; *State v. Benge* (1996), 75 Ohio St.3d 136, 661 N.E.2d 1019; *State v. Clark*, 38 Ohio St.3d 252, 527 N.E.2d 844.

{¶ 203} Accordingly, we affirm appellant's convictions and sentence of death.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and COOK, J., concur separately.

DOUGLAS, J., concurs separately.

LUNDBERG STRATTON, J., concurs in Part I of Cook, J.'s separate concurring opinion.

PFEIFER, J., dissents.

———————————

**DOUGLAS, J., concurring.**

{¶ 204} I concur in the well-reasoned opinion and judgment of the majority. I write separately to comment, only, on section IV of the opinion. Crim.R. 24(F) provides:

"The court may direct that not more than six jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same

oath, and have the same functions, powers, facilities, and privileges as the regular jurors.  An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.  Each party is entitled to one peremptory challenge in addition to those otherwise allowed if one or two alternate jurors are to be impanelled, two peremptory challenges if three or four alternate jurors are to be impanelled, and three peremptory challenges if five or six alternate jurors are to be impanelled.  The additional peremptory challenges may be used against an alternate juror only, and the other peremptory challenges allowed by this rule may not be used against an alternate juror."

{¶ 205} The rule is clear and unequivocal.  It is disturbing that we are seeing a number of cases where the rule is being summarily ignored.  The rule should be followed so long as it remains part of our trial practice.  In a case less egregious than the case at bar, I believe violation of the rule might be grounds for reversal of a conviction.  We should avoid even that possibility by simply following the rule.

{¶ 206} With regard to the application of the rule in death penalty cases, I believe that, while bifurcated, both the guilt phase and the penalty phase are part of one trial.  Accordingly, alternate jurors can be retained until deliberations begin in the penalty phase at which time they should be discharged in accordance with the rule.

————————————

**COOK, J., concurring.**

{¶ 207} Though I would affirm Murphy's convictions and death sentence, I respectfully disagree with the majority's analysis of Murphy's first and tenth propositions of law.

## I. *Miranda*

### A. Invocation of the Right to Cut Off Questioning

{¶ 208} I agree with the majority's conclusion in Part I(A) that Murphy initially waived his right to remain silent during his custodial interrogation by Detective Viduya. But after Murphy made some exculpatory statements, he said to Detective Viduya, "I'm ready to quit talking now and I'm ready to go home, too." The majority decides that when examined "in context" this statement "can be interpreted as meaning simply that appellant was ready 'to go home.' * * * [H]is words did not necessarily mean that he wanted to stop talking, no matter what." I cannot subscribe to the majority's thesis that examining Murphy's statement "in context" should result in this court simply ignoring an operative half of that statement. And I find no legal authority for the majority's proposition that a suspect may only appropriately invoke the right to cut off questioning if he indicates to the police that he does so "no matter what."

{¶ 209} As the majority notes, the standard by which a court assesses a suspect's invocation of the right to cut off questioning during a custodial interrogation is an objective one. With today's decision, the majority suggests that a reasonable police officer, when told by a suspect that he or she is "ready to quit talking," would not understand the meaning of that statement. The implications of this analysis are an affront to law enforcement and could, in future cases, undermine the usefulness of the procedural safeguards established by *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, and *Davis v. United States* (1994), 512 U.S.

452, 114 S.Ct. 2350, 129 L.Ed.2d 362. If *Miranda* and its progeny do not require a suspect to articulate his or her invocation of the Fifth Amendment's procedural safeguards "with the discrimination of an Oxford don," *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355, 129 L.Ed.2d at 371, nor does the law require reviewing courts to assume that law enforcement officers cannot understand plain spoken English. And if *Davis* stands for the proposition that a particular statement constitutes an unambiguous invocation of the right to silence if a reasonable police officer would construe it as such, today's decision subtly twists that rule by suggesting that a particular statement *will not* be deemed sufficiently unambiguous if it is in any way possible for reviewing courts to construe the statement otherwise.

{¶ 210} In addition to rendering half of Murphy's attempted invocation of the right to cut off questioning without meaning or effect, the majority's analysis lacks convincing legal support. The majority relies on *Moore v. Dugger* (C.A.11, 1988), 856 F.2d 129, 134, but in that case the Eleventh Circuit addressed a *question*—not a statement—from a suspect who merely *asked* when police would let him go home. *Id.* at 132. The suspect in *Moore* neither made an affirmative statement to the interrogating officers nor indicated that he was "ready to quit talking," as Murphy did here. Accordingly, *Moore* is hardly persuasive support for the majority's characterization of Murphy's words as ambiguous or equivocal.

{¶ 211} The majority also twice cites a decision of the Wisconsin Supreme Court, *State v. Ross* (1996), 203 Wis.2d 66, 552 N.W.2d 428. But *Ross*, like *Moore*, is of little help here due to significant factual distinctions. The *Ross* court did not even address whether a particular *oral* statement by a suspect in custody constituted an unambiguous invocation of the right to cut off interrogation; rather, the question in *Ross* was whether five to twenty seconds of *silence* following an officer's questions constituted an unambiguous invocation of the right to cut off questioning. *Id.* at 79, 552 N.W.2d at 432. The *Ross* court answered this question in the negative,

as this court did over two decades ago in *State v. House* (1978), 54 Ohio St.2d 297, 8 O.O.3d 292, 376 N.E.2d 588.

{¶ 212} The majority also cites *State v. Owen* (Fla.1997), 696 So.2d 715, and *State v. King* (Me.1998), 708 A.2d 1014, but I find these cases equally unpersuasive. In *Owen,* the defendant's purported invocations of the right to cut off questioning ("I'd rather not talk about it" and "I don't want to talk about it"), *id.* at 717, fn. 4, came in response to specific questions from interrogating officers about what the Florida Supreme Court described as "relatively insignificant details of the crime," *id.* at 717, and these purported invocations occurred only after the defendant had already "acknowledge[d] the conclusiveness" of the state's evidence against him. *Owen,* 560 So.2d at 210-211. Finally, in *King,* the Supreme Judicial Court of Maine provided no explanation for its conclusion that King's statement "I'm just saying, you know, * * * I ain't saying nothing" failed to meet *Davis*'s "standard of clarity." *King,* 708 A.2d at 1016-1017.

{¶ 213} Absent from today's opinion is any mention of the many Ohio cases that have examined suspects' purported invocations in the related context of invoking the right to counsel. See, *e.g., State v. Henness* (1997), 79 Ohio St.3d 53, 62, 679 N.E.2d 686, 695 ("I think I need a lawyer"); *State v. Tefft* (Sept. 2, 1999), Allen App. No. 1-99-35, unreported, 1999 WL 693161 ("Well I'm going to need one"); *State v. Metz* (Apr. 21, 1998), Washington App. No. 96 CA 48, unreported, 1998 WL 199944 ("Maybe I should get a lawyer" and "Do you think I should get a lawyer?"); *State v. Salinas* (1997), 124 Ohio App.3d 379, 387, 706 N.E.2d 381, 386 ("Maybe I want a lawyer, maybe I should talk to a lawyer"); *State v. Mills* (Nov. 24, 1997), Clermont App. No. CA96-11-098, unreported, 1997 WL 727653 ("I'd rather have my attorney here if you're going to talk stuff like that"); *State v. Stover* (Apr. 16, 1997), Lorain App. No. 96CA006461, unreported, 1997 WL 193333 ("I feel like, talk to my, have my lawyer present" and "Well I mean, I'd still like to have my lawyer here").

{¶ 214} In each of the cases cited above, the courts deemed the suspect's purported invocations of the right to an attorney too ambiguous or equivocal to require interrogation to cease. I express no opinion as to the merits of the individual cases listed above; what concerns me now is that Murphy's statement "I'm ready to quit talking now and I'm ready to go home" is being added to this ever-growing list of equivocal statements. As the list grows, we will eventually reach a point where almost nothing that a suspect says will be deemed sufficiently unambiguous to invoke the right to cut off questioning. This puts our courts on a collision course with *Miranda*'s express warning that "[i]f the individual indicates *in any manner, at any time prior to or during questioning*, *that he wishes to remain silent, the interrogation must cease*. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (Emphasis added.) *Miranda,* 384 U.S. at 473-474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.

{¶ 215} Recognizing this dilemma, the United States District Court for the Southern District of Ohio has expressly noted its "reluctan[ce] to hold that a statement invoking the right to remain silent must meet standards of *post hoc* clarity, along the lines of 'I hereby invoke my rights under *Miranda* to remain silent.' " *United States v. Harrison* (Feb. 19, 1993), S.D. Ohio No. CR-3-92-93, unreported, 1993 WL 1367348. In *Harrison*, Judge Rice deemed the suspect's statement that he "didn't want to talk about it right now" to be a sufficiently unambiguous invocation of the right to remain silent. The Sixth Circuit Court of Appeals has likewise determined that the suspect's statement "I can't tell you no more tonight" was an unambiguous invocation of the right to cut off questioning, even though the interrogating officer later testified that he "never drew that kind of

conclusion whatsoever from the conversation we were having." *Kordenbrock v. Scroggy* (C.A.6, 1990), 919 F.2d 1091, 1096-1097.

{¶ 216} In *State v. Martin* (Nov. 10, 1987), Hamilton App. No. C-860610, unreported, 1987 WL 19704, the First District Court of Appeals held that a suspect unambiguously invoked the right to silence by saying, "If I am under arrest, then I am not talking to nobody," even though after three additional questions from the police the suspect agreed to discuss what happened. The First District noted that "[t]he right to remain silent would be of little value if the police were permitted to overcome a suspect's will by badgering him until he made a statement." *Id.* at *2. I agree, and would find Murphy's assertion of his desire to "quit talking" and "go home" as clear and unambiguous as the statements assessed in *Harrison, Kordenbrock,* and *Martin*. Accord *People v. Arroya* (Colo.1999), 988 P.2d 1124, 1133-1134 (deeming "I don't wanna talk no more" unambiguous).

{¶ 217} Detective Viduya, the officer who was actually present in the interrogation room with Murphy when Murphy made the statement at issue here, was on vacation during the hearing on Murphy's motion to suppress. Detective Yates, however, who entered the room with Detective Viduya two minutes after Murphy said that he was "ready to quit talking," did testify at the suppression hearing. According to Detective Yates, Detective Viduya "didn't catch" Murphy's attempted invocation of the right to remain silent at the time he made it because Murphy was "mumbling." If this were true, the state's argument that Murphy failed to invoke clearly and unambiguously the right to cut off questioning would be more persuasive, for an inaudible invocation of the right to cut off questioning can hardly be described as a clear and unambiguous one.

{¶ 218} But Detective Yates's testimony at the suppression hearing is flatly contradicted by the videotape recording of the interrogation, which is also a part of the record here. At approximately 10:57 p.m. on the videotape, Detective Viduya, seated directly in front of Murphy at a small table, said to Murphy, "I'm working

on this homicide, but I'm not the primary investigator, O.K.? I'm going to see if I can get ahold of him, because he knows more details about this than I do." With Detective Viduya still seated at the table and looking directly at him, Murphy responded indignantly (and in a volume *at least* as loud as his previous responses, if not noticeably louder), "I'm ready to quit talking now and I'm ready to go home, too." Still looking directly at Murphy, Detective Viduya responded, "*O.K. Just let me ask him a couple of questions before I come back, all right? You just chill out right there.*" (Emphasis added.) The videotape contradicts Detective Yates's suppression hearing testimony, for it confirms not only that Murphy's statement was clearly audible, but also that Detective Viduya both heard and responded to the statement.

{¶ 219} The videotape also lends support to defense counsel's contention at the suppression hearing that Murphy actually made a *second* futile attempt to invoke his right to cut off questioning. At approximately 11:04:51 p.m. on the videotape, Detective Yates told Murphy, "It's up to you. Do you wanna just go ahead and tell the prosecutor you'll be cooperative, this was an accident?" Murphy tried to respond by shaking his head and saying "I don't really want to talk—" but Yates interrupted Murphy and said, "Do you have any doubt that, from what I did out there at the scene, that I am one hundred percent sure and I can prove it in court that you killed this guy? Do you have any doubt in your mind at all?" I would not assign significant weight to Detective Yates's suppression hearing testimony regarding the clarity of Murphy's *first* attempted invocation when Yates was not in the room at the time, and when the videotape shows Yates himself interrupting Murphy just as Murphy appears to attempt a *second* invocation.

B. Did Police Scrupulously Honor Murphy's Right to Cut Off Questioning?

{¶ 220} Because I would conclude that Murphy unambiguously invoked his right to cut off questioning, and that the trial court's finding to the contrary was clearly erroneous, the question that follows is whether the police "scrupulously honored" that request before reinitiating the interrogation that ultimately resulted in Murphy's inculpatory statements. See *Michigan v. Mosley*, 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 321. As the United States Supreme Court explained in *Mosley*, "[t]hrough the exercise of his option to terminate questioning [the suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Id.* at 103-104, 96 S.Ct. at 326, 46 L.Ed.2d at 321.

{¶ 221} In *Mosley* itself, the court decided that the police had indeed "scrupulously honored" Mosley's request to cut off questioning before reinitiating the interrogation, because "[w]hen Mosley stated that he did not want to discuss the robberies, Detective Cowie immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position. After an interval of more than two hours, Mosley was questioned by another police officer at another location about an unrelated holdup murder. He was given full and complete *Miranda* warnings at the outset of the second interrogation. He was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options. The subsequent questioning did not undercut Mosley's previous decision not to answer Detective Cowie's inquiries." *Id.* at 104-105, 96 S.Ct. at 327, 46 L.Ed.2d at 322.

**{¶ 222}** Later in its opinion, the *Mosley* court reiterated the factors that had led it to believe that the officers had "scrupulously honored" Mosley's invocation of the right to silence, saying that "[t]his is not a case, therefore, where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here *immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been the subject of the earlier interrogation.*" (Emphasis added.) *Id.* at 105-106, 96 S.Ct. at 327, 46 L.Ed.2d at 322.

**{¶ 223}** The United States Supreme Court relied in *Mosley* on factors that are absent from this record to conclude that law enforcement had scrupulously honored Mosley's invocation of the right to cut off questioning. Though Detective Viduya left the room immediately after Murphy told him that he wanted to "quit talking," Detective Viduya returned just *two minutes later* with Detective Yates. Yates, who admitted at trial to playing the "bad cop" role at this stage of the interrogation, promptly introduced himself as the crime scene investigator with a "pat" case against Murphy. *Without additional rewarnings*, the two detectives resumed their interrogation of Murphy *about the same crime.* This interrogation included additional questions from Detective Viduya—the *very same detective* who, only minutes earlier, had heard Murphy assert his desire to "quit talking" and had responded to that assertion by saying "O.K." and leaving the room.

**{¶ 224}** I would conclude, therefore, that the instant case is distinguishable from *Mosley* and that the interrogating officers in this case did not scrupulously honor Murphy's invocation of the right to cut off questioning. See *State v. Thompson* (Jan. 24, 2001), Jefferson App. Nos. 98 JE 28 and 98 JE 29, unreported, 2001 WL 69197 (invocation of right to remain silent not scrupulously honored

where suspect was interrogated a second time after an undetermined amount of time had elapsed and suspect was not rewarned); *United States v. Clayton* (E.D.Wis.1976), 407 F.Supp. 204, 207 (invocation not scrupulously honored where "salient facts in *Mosley*" were absent; suspect was twice questioned within an hour by the same officer concerning the same crime); *Harrison,* 1993 WL 1367348, at *3; *Kordenbrock,* 919 F.2d at 1097.

## C. Harmless Error

{¶ 225} Having decided that Murphy's interrogators did not scrupulously honor Murphy's invocation of the right to cut off questioning, I would next determine the legal consequences of any improperly admitted inculpatory statements.

### 1. *Arizona v. Fulminante*

{¶ 226} As the United States Supreme Court has noted, the admission of an improperly obtained confession is a "trial error"—not a "structural" one—that is subject to review under the same "harmless error" standard as other trial errors. *Arizona v. Fulminante* (1991), 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1264-1265, 113 L.Ed.2d 302, 331. See, also, *Milton v. Wainwright* (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (holding that the admission of a confession, even if obtained in violation of *Massiah v. United States* [1964], 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, was harmless beyond a reasonable doubt). In *Fulminante*, the Supreme Court decided that "[w]hen reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Id.*, 499 U.S. at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 332. Though *Fulminante* concerned the application of the harmless-error standard of review to an *involuntary* confession, "*a fortiori* a confession held inadmissible by reason of having been obtained in violation of the

prophylactic *Miranda* requirements also must be subject to a harmless-error standard of review." *People v. Sims* (1993), 5 Cal.4th 405, 447, 20 Cal.Rptr.2d 537, 562, 853 P.2d 992, 1017.

## 2. Other Courts' Application of the Harmless-Error Standard

{¶ 227} As the Sixth Circuit has noted, "The harmless error inquiry is fact specific and requires an analysis of the particular facts at hand." *Kordenbrock,* 919 F.2d at 1097. And as our own court has stated, "Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of [the] defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph six of the syllabus. In order to assess meaningfully whether the improper introduction of Murphy's post-invocation videotaped statements was harmless beyond a reasonable doubt, it is helpful to examine briefly some other cases in which reviewing courts were faced with the same issue.

{¶ 228} In *Fulminante, supra,* the Supreme Court decided that the erroneous introduction of Fulminante's coerced jailhouse confession to an FBI informant was not harmless because "[a]bsent the confessions, it is unlikely that Fulminante would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Id.*, 499 U.S. at 297, 111 S.Ct. at 1258, 113 L.Ed.2d at 323. In addition, the admission of Fulminante's confession led to the admission of other evidence prejudicial to Fulminante; specifically, that Fulminante "willingly sought out the company of criminals" for counsel. *Id.* at 300, 111 S.Ct. at 1260, 113 L.Ed.2d at 325.

{¶ 229} In *Kordenbrock v. Scroggy, supra,* the Sixth Circuit likewise concluded that the introduction of the defendant's confession, which had been obtained after the defendant invoked his right to cut off questioning, was not harmless error and granted habeas corpus relief. *Id.,* 919 F.2d at 1100. In

58

*Kordenbrock*, as here, the defendant knew before trial that his confession was going to be admitted as evidence. At trial, then, Kordenbrock made a strategic decision to confess to the homicide—but not to confess to the element of premeditation—in his opening statement to the jury. *Id.* at 1098. The Sixth Circuit conceded that there was "independent evidence" that Kordenbrock had committed a premeditated killing, but noted that there was "*no explicit evidence other than the confession that plainly tended to contradict Kordenbrock's contention that he was under the influence of drugs and alcohol and did not intend to cause death*." (Emphasis added.) *Id.* at 1100. Accordingly, the *Kordenbrock* court concluded that the erroneous introduction of the confession was not harmless, distinguishing *Kordenbrock* from an earlier case in which eyewitness testimony had confirmed that the defendant was not acting in self-defense, as he claimed. *Id.*, 919 F.2d at 1099-1100, citing *Burks v. Perini* (C.A.6, 1986), 810 F.2d 199, 1986 WL 18388, unpublished opinion.

{¶ 230} In *State v. Bucklew* (Mo.1998), 973 S.W.2d 83, 90, on the other hand, the Supreme Court of Missouri determined that police had scrupulously honored Bucklew's Fifth Amendment rights and that his videotaped confession was properly admitted. Even so, the court concluded that if the trial court's refusal to exclude the videotaped statement was indeed error, it was harmless, because an eyewitness testified to every element of first degree murder. *Id.* at 91. Similarly, in *Riggs v. State* (1999), 339 Ark. 111, 127-129, 3 S.W.3d 305, 314-315, the Supreme Court of Arkansas determined that Riggs's statement, which included a detailed confession regarding the premeditated killings of her two young children, was properly admitted despite Riggs's claim that the statement was involuntarily made. The *Riggs* court concluded that, even if the statement should have been suppressed, the jury heard "abundant" additional evidence that Riggs committed the murders. *Id.* at 130, 3 S.W.3d at 316.

3. Applying the Foregoing Principles to the Instant Case

**{¶ 231}** The state contends that even absent Murphy's confession, "there was overwhelming evidence to support his conviction[s]" for aggravated robbery and aggravated murder, and that based upon the whole record, any constitutional error related to the introduction of the confession at trial was harmless beyond a reasonable doubt. I would agree, for I find the instant case distinguishable from *Fulminante* and *Kordenbrock* and more analogous to *Burks, Bucklew,* and *Riggs.*

**{¶ 232}** In *Fulminante*, the Supreme Court's independent evaluation of the record led it to conclude that "both the trial court and the State recognized that *a successful prosecution depended on the jury believing the two confessions. Absent the confessions, it is unlikely that Fulminante would have been prosecuted at all.*" (Emphasis added.) *Id.,* 499 U.S. at 297, 111 S.Ct. at 1258, 113 L.Ed.2d at 323. The Supreme Court also found it significant that the admission of Fulminante's confession led to the admission of other prejudicial evidence. *Id.* at 300, 111 S.Ct. at 1259, 113 L.Ed.2d at 325. In *Kordenbrock*, the Sixth Circuit was concerned that there was "no explicit evidence other than the confession" that "plainly" established the defendant's *mens rea*. *Id.*, 919 F.2d at 1100.

**{¶ 233}** These concerns do not, however, apply to the case at bar. Given that Condrea Webber, an eyewitness to Murphy's entire confrontation with Brooks, picked Murphy out of a photo array shortly after the killing, and that an employee of the F&H Bar & Grill corroborated Webber's eyewitness identification by testifying that he saw Murphy follow the victim out of the bar, it is unlikely that the police would have decided *not* to prosecute Murphy for these offenses had Murphy never confessed to them. Moreover, as in *Burks*, 810 F.2d 199, here there *was* compelling eyewitness testimony from Webber tending to show Murphy's *mens rea*. In fact, as in *Bucklew*, 973 S.W.2d 83, Webber's detailed account of her brother's killing went to each element of the charged offenses.

**{¶ 234}** The state opened both its opening statement and its case-in-chief by focusing on Webber's eyewitness account of the events that occurred behind the

F&H Bar & Grill—the state did not "lead" with the inculpatory statements that Murphy made following his invocation of the right to cut off questioning. Webber testified that she watched "everything that was going on" the "whole time." Asked if she had trouble seeing the assailant clearly, Webber responded, "No, I could see him. And I really got the best look at him when I opened the car door to turn around and tell him that we didn't have anything." Webber testified that Murphy eventually grew impatient with Brooks's effort to remove his necklaces, took a step back, and shot Brooks multiple times at close range with a large weapon that Murphy had been pointing and waving at Brooks's head and chest. According to Webber, Murphy stepped back and shot Brooks while Brooks's hands were "[u]p trying to get his chains off." Webber's detailed eyewitness account of events was persuasive evidence that Murphy purposely caused Brooks's death while committing, attempting to commit, or fleeing immediately after committing an aggravated robbery.

{¶ 235} Though the defense tried to cast doubt on the reliability of Webber's identification of Murphy by pointing to the late hour and lack of illumination in the area, the state effectively responded to this tactic with the testimony of the crime scene technician, William Snyder, who had included two nearby light sources in his computer drawing of the scene. The deputy coroner testified that both of Brooks's bullet wounds resulted from close-range shots, and a firearms examiner testified that the weapon from which the bullets were fired was unlikely to have discharged by bumping or dropping. Even before the state introduced Murphy's videotaped statement at the conclusion of its case-in-chief, then, the state had built a strong case against Murphy going to all the elements of aggravated robbery and murder.

{¶ 236} Though the state mentioned Murphy's confession in its opening and closing statements, and played the videotape of Murphy's interrogation for the jury at the conclusion of its case-in-chief during the testimony of Detective Yates,

the trial court prohibited the state from rehashing Murphy's inculpatory statements after the jury viewed the tape. And unlike *Fulminante*, the transcript here does *not* indicate that the trial court and the state "recognized that a successful prosecution *depended* on the jury believing" the confession. (Emphasis added.) *Id.*, 499 U.S. at 297, 111 S.Ct. at 1258, 113 L.Ed.2d at 323.

{¶ 237} For these reasons, though I believe that Murphy unambiguously invoked the right to cut off questioning and respectfully disagree with the majority's analysis to the contrary, I would, like the majority, overrule Murphy's first proposition of law. The state introduced abundant, independent proof of Murphy's guilt, and the erroneous admission of Murphy's videotaped post-invocation statements was harmless beyond a reasonable doubt.

## II. Alternate Jurors/Ineffective Assistance of Counsel

{¶ 238} I also write separately to address the majority's analysis of the "alternate juror" problem that Murphy raises in his seventh and tenth propositions of law. In his seventh proposition, Murphy claims that the trial court deprived him of his right to a fair trial by allowing the alternates to remain in the jury room during deliberations in both phases of his trial. I agree with the majority that under *United States v. Olano* (1993), 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508, Murphy's failure to object to the alternates' presence in the jury room results in a plain-error standard of review. And because Murphy has not shown that the outcome of the trial would have been otherwise had the trial court properly excluded alternates from the jury room during deliberations, I agree with the majority's resolution of Murphy's seventh proposition of law.

{¶ 239} I respectfully disagree, however, with portions of the majority's analysis of Murphy's tenth proposition of law, which also implicates the alternate-juror issue. In his tenth proposition, Murphy claims that his attorney's failure to object to the presence of alternates in the jury room constituted ineffective assistance of counsel. The majority writes that "[t]he record does not disclose why

counsel did not object; and appellant has failed to carry his burden of persuasion on this issue." I write separately to clarify that an ineffective-assistance-of-counsel claimant has no burden of persuasion on the issue of *why his attorney did not object* to a particular trial error. As the majority correctly notes earlier in its opinion, an appellant raising a claim of ineffective assistance of counsel must only show (1) that counsel performed deficiently, and (2) that there was a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. See *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus. Though the state will often try to overcome claims of ineffective assistance of counsel by hypothesizing *why* an attorney might have failed to object (by suggesting that defense counsel's failure to object was reasonable trial strategy, for example) the appellant bears no burden of persuasion *on this issue*.

**{¶ 240}** Finally, I disagree with the majority's citation to *Olano* at the conclusion of its analysis of Murphy's claim of ineffective assistance of counsel. I do not disagree with *Olano*'s formulation of the plain-error standard of review, but the standard for prejudice under the plain-error rule differs from the standard for prejudice in an ineffective-assistance-of-counsel claim, and we should studiously avoid mixing the two concepts.

**{¶ 241}** An error is not prejudicial for purposes of *plain-error* review unless, "*but for the error, the outcome of the trial clearly would have been otherwise.*" (Emphasis added.) *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. But *Strickland* "prejudice" is different. In fact, the *Strickland* court expressly rejected an outcome-determinative standard for prejudice in the context of ineffective assistance of counsel claims, describing such a standard as "not quite appropriate." *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 697. The *Strickland* court explained:

"[W]e believe that a defendant need *not* show that counsel's deficient conduct more likely than not altered the outcome in the case.

" * * *

"*[T]he appropriate standard of prejudice should be somewhat lower.*  The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

"Accordingly, * * * [t]he defendant must show that there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

"In making the determination whether the specified errors resulted in the required prejudice, a court should presume * * * that the judge or jury acted according to law." (Emphasis added.) *Id.* at 693-694, 104 S.Ct. at 2068, 80 L.Ed.2d at 697-698.  See, also, *State v. Pettit* (July 5, 2000), Vinton App. No. 99CA529, unreported, 2000 WL 897993 (holding that erroneous jury instructions did not amount to plain error, but that counsel performed deficiently in failing to object to the erroneous instructions and that there was a reasonable probability that the trial outcome would have been different had counsel objected and the court given the appropriate instruction).

{¶ 242} For the foregoing reasons, I would resolve Murphy's claim of ineffective assistance of counsel regarding the presence of the alternate jurors somewhat differently than does the majority.  Under the first prong of the *Strickland* analysis, I would conclude that Murphy's counsel performed deficiently by failing to object to the presence of alternates in the jury room during deliberations.  I would reach this conclusion because (1) the presence of alternates in the jury room during deliberations violated Crim.R. 24(F); (2) a timely objection by Murphy's counsel may have formed the basis for a successful motion for new trial under Crim.R.

33(A)(1) ("Irregularity in the proceedings"); and (3) this court has recently upheld a trial court's decision in a *civil* case to *sua sponte* declare a mistrial when it discovered the presence of an alternate in the jury room during deliberations, even though the alternate assured the judge that he had contributed nothing to the jury's verdict. *Koch v. Rist* (2000), 89 Ohio St.3d 250, 730 N.E.2d 963.[3]

{¶ 243} Moving to the second prong of *Strickland*, however, I would conclude that Murphy has failed to show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. In his brief, Murphy refers only generally to the "numerous dangers" present in the trial court's "unusual" and "inherently problematic" procedure with the alternates.

{¶ 244} Murphy's generalized concerns do not undermine one's confidence in the outcome of this case. See *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697 ("not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding"). During its instructions to the jury, the trial court admonished the alternates that "by law you are not permitted to participate in the deliberations in any fashion. That means that you are not permitted to make any type of gestures, perhaps any signs by way of facial movements, which we understand is a difficult task, but that is what the law does require. You are not permitted to participate in the deliberations unless and until, if ever, one of the other members of the jury would not be able to conclude their service in the case." The judge reiterated this explicit warning just before the

---

3. In *Koch*, a majority of this court decided that "the case before us involves extraordinary misconduct where a stranger to the jury entered the jury room and remained there throughout the entire deliberative process." *Koch*, 89 Ohio St.3d at 251, 730 N.E.2d at 965. This court's opinion in *Koch*, however, was released after Murphy's trial had already concluded, and decided an issue of first impression in Ohio. *Id.* Thus I cannot charge Murphy's trial counsel with knowledge of this court's decision in *Koch*. I cite *Koch* simply as persuasive support for my conclusion that Murphy's counsel performed deficiently by failing to object to the presence of alternates in the jury room. That this court had not yet spoken on the consequences of a particular trial error does not excuse trial counsel's failure to preserve an objection to that error.

jury retired to deliberate, saying, "Just remind the alternate jurors again about not being able to participate in any manner in the deliberations during this time." Murphy provides no specific basis for concluding that the alternate jurors failed to adhere to the trial court's explicit instructions. Because we presume, for purposes of *Strickland*'s second prong, that the jury acted in accordance with law, see *id.,* 466 U.S. at 694-695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698, and because Murphy has given me no reason to believe that the alternates failed to adhere to the judge's instructions, I would overrule Murphy's tenth proposition of law.

MOYER, C.J., concurs in the foregoing concurring opinion.

LUNDBERG STRATTON, J., concurs in Part I of the foregoing concurring opinion.

————————

**PFEIFER, J., dissenting.**

{¶ 245} I agree with Justice Cook's concurrence, except that I do not believe that the error in failing to halt Murphy's interview was harmless. I write separately to address several other issues.

{¶ 246} "The constitutional purpose of statutory aggravating circumstances is to narrow the class of murderers to those deserving society's ultimate punishment, the death penalty. *Zant v. Stephens* (1983), 462 U.S. 862, 877, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235, 249-250. See Rosen, Felony Murder and the Eighth Amendment Jurisprudence of Death (1990), 31 B.C.L.Rev. 1103, 1121." *State v. O'Neal* (2000), 87 Ohio St.3d 402, 421, 721 N.E.2d 73, 91-92 (Pfeifer, J., dissenting). The felony-murder rule embodied in R.C. 2929.04(A)(7), the aggravating circumstance charged and proved in this case, is not particularly well suited for guidance in distinguishing between those who deserve death and those who do not. One state supreme court has struck down the statute listing simple felony murder as an aggravating circumstance, holding that it failed to sufficiently narrow the class of death-eligible offenders. *State v. Middlebrooks* (Tenn.1992),

840 S.W.2d 317, 347.[4]   One commentator has called felony murder the "least defensible" aggravating circumstance.   Ledewitz, The New Role of Statutory Aggravating Circumstances in American Death Penalty Law (1984), 22 Duq. L.Rev. 317, 380, fn. 230.  This case is a good example of why they reached those conclusions.

{¶ 247} The aggravating circumstance in this case is standard felony murder.  If Murphy had not demanded or taken the gold chains worn by Brooks, the death penalty would not have been possible in this case.  Although the mitigating circumstances are not overwhelming, the record indicates that Murphy had significant developmental disadvantages.  Basically, he had never been taught right from wrong.   In spite of this, he had no documented history of violent behavior.

{¶ 248} Murphy is not the type of hard-core criminal targeted by the death penalty, the type who cold-bloodedly plans and executes murders.  See *State v. Smith* (2000), 87 Ohio St.3d 424, 721 N.E.2d 93; *State v. Green* (2000), 90 Ohio St.3d 352, 738 N.E.2d 1208.  Murphy committed a heinous, senseless act.  He shot and killed Andre Brooks.  The lives of Brooks's family and friends have been irreparably altered.  Brooks himself will never again have the chance to experience the joys and sorrows of life.  That is tragic and nothing can change it.  Murphy must be severely punished for the murder he committed.   We are required to independently determine whether his punishment should include a sentence of death.

{¶ 249} R.C. 2929.04(B) and (B)(7) require the sentencer to consider "the history, character, and background of the offender" and "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death."  If our obligation to independently weigh mitigating factors against each aggravating

---

4. The Tennessee legislature amended the offending statute in response to *Middlebrooks*.  See Tenn.Code Ann. 39-13-204(i)(7).

circumstance is to mean anything, this court must, when the circumstances warrant, reverse a sentence of death. We must distinguish between a defendant's guilt and whether he should be put to death. See Crocker, Concepts of Culpability and Deathworthiness: Differentiating between Guilt and Punishment in Death Penalty Cases (1997), 66 Fordham L.Rev. 21.

{¶ 250} We are required by statute to conduct a proportionality review in which we "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." R.C. 2929.05(A). This court has construed this language to limit review to similar cases in which the death penalty was imposed. *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus. However, the "similar cases" language of R.C. 2929.05(A) is ambiguous. A narrow interpretation, such as this court's current one, is a possibility. Another is that "similar cases" refers more broadly to all factually similar cases, whether or not a capital specification was charged or proved.

{¶ 251} In my view, Murphy should be compared to the universe of all Ohio cases in which a person was killed during the course of a robbery, not just to cases in which a person was killed during the course of a robbery and in which a sentence of death was imposed. When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality. The lowest common denominator becomes the standard. This result is ethically indefensible.

{¶ 252} Apparently to assist us in reviewing proportionality, R.C. 2929.021 requires that certain information for each indictment charging aggravated murder be provided to our court. However, the information provided is incomplete. It does not include race or any other constitutionally significant factors that this court could use to determine whether our justice system fairly treats all the defendants that come before it. It is time for this court to augment the statutorily required

information we do receive by gathering constitutionally significant information that could assist us in analyzing proportionality.

{¶ 253} Murder that fits within the four corners of the death penalty statute does not necessarily merit prosecution as a death penalty case. R.C. 2929.04(A) states that "[i]mposition of the death penalty for aggravated murder is precluded unless one or more of the following [aggravating circumstances] is specified in the indictment * * * and proved beyond a reasonable doubt." The statute does not *require* prosecutors to seek the death penalty whenever an aggravating circumstance can be proven beyond a reasonable doubt; it simply prohibits them from seeking the death penalty absent a statutory aggravating circumstance. Prosecutors are expected to exercise their discretion when seeking the death penalty. When Ohio's death penalty statute was enacted, it was designed to be narrowly tailored to allow the execution of only the most vile and evil murderers.

{¶ 254} The death penalty scheme established by the General Assembly is demonstrably better than those of Texas or Illinois. But it is only as good as the principals in our criminal justice our system make it. Prosecutors must continue to zealously pursue convictions while tempering their desire to seek death. Defense attorneys must continue to zealously advocate even when, as in this case, guilt is beyond doubt. Trial judges must continue to ensure that defendants receive the full protections of the Constitution. Juries must continue to receive as much information as is necessary to fulfill their duties and responsibilities. Each principal in the system must continually strive to ensure that we sentence to death only those murderers who truly deserve death.

{¶ 255} This court is no different. We must be willing to do serious proportionality review. Even though approximately two hundred males currently

reside on death row,[5] this court has never overturned a death sentence based on proportionality review. "Proportionality review" must be more than hollow words, it must someday mean that this court will overturn a sentence of death based solely on proportionality review.

**{¶ 256}** Finally, alternate jurors were in the jury room during both the guilt and penalty phases while the jury deliberated. Crim.R. 24(F) states that "[a]lternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. * * * An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." It is readily apparent that Crim.R. 24(F) was violated because the alternate jurors were not discharged properly. Further, allowing the alternate jurors to be present during jury deliberations violated the sanctity of the jury process. See *United States v. Virginia Erection Corp.* (C.A.4, 1964), 335 F.2d 868, 872; *Koch v. Rist* (2000), 89 Ohio St.3d 250, 252, 730 N.E.2d 963, 965. As in *Koch*, which involved a civil trial, "the case before us involves extraordinary misconduct where a stranger to the jury entered the jury room and remained there throughout the entire deliberative process." *Id.* at 251, 730 N.E.2d at 965.

**{¶ 257}** I likely would find that this error alone warrants a reversal of the death sentence, even under a plain error standard. However, I need not so find given the other issues discussed above. After reviewing the record, weighing the aggravating circumstance against the mitigating factors, and considering proportionality, I conclude that the sentence of death should be reversed and that Murphy should be sentenced to life in prison without parole.

---

5. The Ohio Department of Corrections website lists two hundred and one death row inmates, all male, as of April 2, 2001 (ftp://ftp.sconet.state.oh.us/opinions/2001/981586.pdf). See http://www.drc.state.oh.us/public/deathrow.htm.

*Ron O'Brien*, Franklin County Prosecuting Attorney, and *Susan E. Day*, Assistant Prosecuting Attorney, for appellee.

*W. Joseph Edwards* and *Barbara A. Farnbacher*, for appellant.

_____